**In the Matter of the Application of NE-BRASKA PUBLIC POWER DISTRICT FOR A PERMIT TO CONSTRUCT AND OPERATE the PROPOSED MANDAN NOMINAL 500 KV TRANSMISSION FACILITY.**

**Nos. 14008 to 14010.**

Supreme Court of South Dakota.

Argued Sept. 13, 1983.

Decided Aug. 8, 1984.

Rehearing Denied Sept. 24, 1984.

Joe Nadenicek, Asst. Atty. Gen., Pierre, for appellant South Dakota Public Utilities Com'n in No. 14008. Mark V. Meierhenry, Atty. Gen., Pierre, on the brief.

Jeff Masten of Masten, Myrabo, Irons & Kunstle, P.C., Canton, for appellant Safe Energy Alternatives of South Dakota in No. 14009. Benjamin Stead, Des Moines, Iowa, on the brief.

Lloyd C. Richardson, Jr. of Richardson, Groseclose, Kornmann, Wyly, Wise & Klinkel, Tom Watson of Crowell & Moring, Washington, D.C., for appellant Nebraska Public Power Dist. in No. 14010. Charles B. Kornmann of Richardson, Groseclose, Kornmann, Wyly, Wise & Klinkel, Aber-

deen, and Jeffrey J. Davidson of Crowell & Moring, Washington, D.C., on the brief.

Gene N. Lebrun of Lynn, Jackson, Shultz & Lebrun, Rapid City, for amicus curiae Basin Elec. Power Co-op. and Rushmore Elec. Power Co-op., Inc.

Warren W. May of May, Adam, Gerdes & Thompson, Pierre, for amicus curiae Otter Tail Power Co.

DAVIS, Circuit Judge.

## FACTS

On January 14, 1981, Nebraska Public Power District (NPPD) applied for a permit to construct the proposed MANDAN Trans-State Transmission Facility pursuant to SDCL Chapter 49–41B.[1] Public hearings were held in March 1981. One year later, the South Dakota Public Utilities Commission (PUC) denied NPPD's request for a permit to allow the MANDAN Project access through South Dakota. The trial court reversed the PUC's denial of access, but affirmed a number of terms and conditions the PUC would have imposed on NPPD if the permit had been granted. We affirm the trial court in part and reverse in part.

The MANDAN Project is an international and interstate electric transmission facility extending from an existing Canadian substation in Manitoba to unbuilt substations in North Dakota, South Dakota, and Nebraska. MANDAN would provide seasonal diversity exchange of electricity between summer and winter peaking service areas. Seasonal diversity exchanges allow each utility fuller utilization of its existing generating capacity rather than building new plants and transmission lines to meet peak season demands.

Utilities which serve South Dakota or North Dakota could participate in any quantity up to the total amount of seasonal diversity exchange available to all participants. Because prospective participants need only be interconnected with another utility which is connected to MANDAN, it is unnecessary to build a new transmission facility that directly connects to MANDAN.

Prior to July 1, 1981, a transmission facility applicant was required to establish four standards. NPPD's studies, documents and statements were completed in compliance with the four standards.

Effective July 1, 1981, the South Dakota Legislature amended SDCL 49–41B–22 to include a fifth standard. Even though this requirement became effective more than five months after NPPD filed its application, the PUC required NPPD to establish the fifth standard. The PUC further ordered NPPD to deposit an additional $55,963.50 on December 28, 1981. This amount was in addition to the initial deposit pursuant to SDCL 49–41B–22, which was based on the PUC's estimate of the cost of processing the application but limited to a specified percent of the estimated "construction cost." In assessing the additional deposit, the PUC included finance and interest cost, land acquisition cost, administrative and general overhead cost and engineering cost as "construction cost." The PUC denied NPPD's request for refund one year later.

The PUC entered its order with findings of fact, reserved rulings and conclusions of law on January 14, 1982. Included within the 222 findings of fact were 70 terms and conditions that would be imposed if NPPD's permit was granted. Since only two of those 70 terms and conditions were appealed from, only those will be discussed. First, the PUC directed NPPD to utilize H-frame pole structures instead of the lattice steel towers which NPPD had selected, at an increased cost of $13 million. This condition was justified for three reasons: 1) farming inconvenience, 2) visual impact, and 3) the amount of land taken out of crop production.

Second, the PUC required NPPD to abandon its proposed method of soil restoration, which utilizes subsoiling and intensive surface tillage, and utilize the PUC's system of stripping, stockpiling and replac-

---

1. "MANDAN" is an acronym for Manitoba, Dakotas, and Nebraska.

ing topsoil in the construction path, at an increased cost of $4 million. Further, affected landowners would receive written notice of topsoil separation and stockpiling; landowners could, if they desired, require that NPPD utilize other specified topsoil preservation procedures on their land. The PUC topsoil removal and stockpile requirement would become effective automatically if the landowner had not responded within ten days.

The PUC also entered a number of reserved rulings concerning SDCL 49–41B–22(5). The PUC proceeded on the assumption that the statute was constitutional and left the determination of unconstitutionality to the courts. Further, the PUC concluded that Section 5 was a procedural rather than a substantive amendment and could be retroactively applied. As a result, the PUC found that NPPD was not substantially prejudiced by being required to submit evidence on the fifth requirement. Finally, the PUC determined that even if SDCL 49–41B–22(5) was substantive, it could be retroactively applied to NPPD since an intent to apply it retroactively plainly appeared from legislative history and circumstances surrounding its enactment.

The PUC entered 17 conclusions of law. Only four are contested in this appeal. First, the PUC did not grant NPPD's request for a 120 foot general variance from the precise centerline of the route to deal with unforeseen circumstances arising during construction. It reasoned that it did not have the authority and that the grant of a general variance would violate the PUC's route specific requirements, would deny parties an opportunity to assess the proposed route, and would place the PUC in a potential dilemma of granting a permit that was not route specific, which would violate its rules and precedents or violate SDCL 49–41B–36. Second, the PUC declined to preempt or supersede existing county, or municipal rules, regulations, resolutions or ordinances, again reasoning that such action was outside its authority. Third, the PUC determined that NPPD had conditionally met the first four standards

of SDCL 49–41B–22; however, the PUC found that NPPD had failed to establish the fifth requirement. Fourth, the PUC denied NPPD's application for the proposed MANDAN project.

NPPD appealed the PUC's decision to the circuit court. The trial court reversed the PUC decision in part and affirmed it in part. Initially, the court reversed the PUC's denial of NPPD's permit; it reasoned that the PUC had unlawfully applied SDCL 49–41B–22(5) retroactively. However, the circuit court affirmed two PUC terms and conditions: the H-frame pole structure; and stripping, stockpiling and replacing all topsoil from the construction area to a depth of eighteen inches. The trial court found that these two conditions were supported by substantial evidence.

The trial court also clarified the PUC's authority and remanded two matters to the PUC. It directed the PUC to grant NPPD's requested general variance if the evidence in the record supported such a finding. Further, the court ordered the PUC to exercise its statutory authority to preempt or supersede local land use regulations if such a finding was warranted by the evidence in the record.

Finally, the court determined that the PUC had erred as a matter of law when it interpreted the term "construction costs" to include finance and interest costs, land acquisition costs, preliminary engineering costs, administrative and general overhead costs and ordered NPPD to deposit an additional $55,963.50. As a result, the trial court directed the PUC to return NPPD's additional deposit, together with interest at the judgment rate.

The PUC, NPPD and Safe Energy Alternatives of South Dakota (SEA) appealed the circuit court decision to this court. Otter Tail Power Company, Basin Electric Power Cooperative, and Rushmore Electric Power Cooperative, Inc. filed briefs as amicus curie. Seven issues are presented in this appeal: the constitutionality of SDCL 49–41B–22(5); the PUC's H-frame pole structure requirement; the PUC's topsoil

preservation procedures; the PUC's preemption of local land use provisions; the PUC's grant of a general variance from the centerline of MANDAN; the PUC's requirement of NPPD's additional deposit; and the PUC's Finding of Fact Number 10.

## CONSTITUTIONALITY OF SDCL 49–41B–22(5)

■ Prior to July 1, 1981, SDCL 49–51B–22 required applicants to establish four conditions. In 1981 the statute was amended to include a fifth requirement, which states:

That the proposed trans-state transmission facility will be consistent with the public convenience and necessity in any area or areas which will receive electrical service, either direct or indirect, from the facility, regardless of the state or states in which such area or areas are located.

SDCL 49–41B–22(5).

A "trans-state transmission facility" is defined as

an electric transmission line ... which originates outside the state of South Dakota, crosses this state and terminates outside the state of South Dakota; and which transmission line and associated facilities delivers electric power and energy of twenty-five percent or less of the design capacity of such line and facilities for use in the state of South Dakota.

SDCL 49–41B–2(11).

Seven weeks after NPPD filed its application, the PUC required it to establish the additional condition set forth in SDCL 49–41B–22(5). NPPD complied with the PUC's request, but reserved its constitutional argument if the PUC's decision was appealed.

In its order, the PUC ruled that NPPD had conditionally established the first four requirements of SDCL 49–41B–22, but had failed to fulfill the fifth requirement. On appeal, the circuit court determined that because NPPD had filed its application more than five months prior to the date SDCL 49–41B–22(5) became effective, the fifth requirement was unlawfully applied. As a result, the trial court did not reach the constitutional issue.

On appeal to this court, NPPD advances two arguments. First, the fifth requirement is unconstitutional because it violates the commerce clause of the United States Constitution. Second, if the statute is constitutional, it was applied unlawfully because a statute, even in an administrative proceeding, cannot be applied retroactively unless the statute specifically directs such retroactive application. We believe that the constitutionality of SDCL 49–41B–22(5) is the threshold issue in this appeal. We choose not to deal with the issue of retroactive application of the fifth requirement.

This court, as well as the United States Supreme Court, has not hesitated to strike down statutes which obstruct interstate commerce. *Direct Auto Buying Service, Inc. v. Welch,* 308 N.W.2d 570 (S.D.1981). *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174, 178 (1970), sets forth three criteria to determine the validity of state statutes affecting interstate commerce: "(1) The statute must regulate evenhandedly, and (2) it must only incidentally affect interstate commerce; and (3) its burden on interstate commerce cannot be clearly excessive in relation to the benefit derived by the public." *Direct Auto Buying Service, Inc., supra,* 308 N.W.2d at 573. Failure to satisfy any one of these constitutional requirements will cause a statute to fail.

The facts established that MANDAN is a trans-state transmission line; it begins and ends outside the state of South Dakota, crosses this state, and will deliver less than twenty-five percent of its design capacity to South Dakota. Because of this factual situation, NPPD must satisfy a fifth requirement: that MANDAN will be consistent with the public convenience and necessity in areas which receive electrical service, regardless of the state in which the area is located. SDCL 49–41B–22(5). If the MANDAN Project delivered more than twenty-five percent of its design capacity to South Dakota, it would be completely excused from this requirement. Since MANDAN does not deliver more than

twenty-five percent, it must satisfy yet one more condition. We conclude that the statutory requirement effectively places a burden on interstate commerce.

The remaining issue focuses on the local putative benefits, if any, this statute serves. *Direct Auto Buying Service, Inc., supra.* The PUC argues that the fifth requirement is a valid exercise of the state's police power to protect the public health, safety and welfare. This protection is provided, however, in the first four conditions of SDCL 49–41B–22 and applies to both intrastate and interstate facility applicants. It is noteworthy that the PUC has already ruled that the MANDAN Project "would not substantially impair health, safety and welfare."

The fifth requirement of SDCL 49–41B–22 adds nothing to the protection of public health, safety and welfare that is not provided by the first four requirements. Instead, its practical effect significantly obstructs interstate electrical exchanges by requiring certain applicants to satisfy an additional burden. The commerce clause was specifically designed to prevent this type of obstruction.

We hold that SDCL 49–41B–22(5), requiring a transmission facility originating and ending outside South Dakota, crossing the state and delivering twenty-five percent or less of its design capacity to this state, to satisfy an additional condition of public necessity and convenience, regardless of the state where the area is located, violates the commerce clause of the United States Constitution and therefore is unconstitutional.

### PUC'S H–FRAME POLE STRUCTURE REQUIREMENT

◼ In its findings of fact, the PUC directed NPPD to abandon its proposed system of lattice towers and to utilize H-frame towers if NPPD's permit was granted. The circuit court affirmed this finding, concluding that it was supported by substantial evidence in the record. On appeal, NPPD challenges the circuit court determination on three bases: the PUC exceeded its authority when it dictated what tower design must be used; the circuit court utilized an incorrect standard of review, which mandates reversal; and the PUC order is clearly erroneous.

SDCL 49–41B–24 states in part that

the public utilities commission shall make complete findings in rendering a decision regarding whether a permit should be granted ... upon such terms, conditions or modifications of the construction, operation or maintenance as the commission may deem appropriate.

Clearly, the PUC's authority in imposing conditions is limited to construction, operation or maintenance. The H-frame requirement is not a construction, operation or maintenance condition. It does not dictate how the MANDAN line should be constructed, operated or maintained. Instead, the H-frame condition specifies what facility design will be constructed.

Further, the evidence in the record does not demonstrate how the H-frame structures will be operated or maintained differently from lattice structures. Therefore, the PUC's H-frame structure requirement is not a condition of construction, operation or maintenance; instead it is a design condition. As such, the PUC exceeded its statutory authority by imposing this H-frame requirement.

◼ The circuit court's decision must also be reversed because the PUC decision was affirmed under an erroneous standard of review, the substantial evidence test. The legislature changed the standard of review from "substantial evidence" to "clearly erroneous" effective July 1978. SDCL 1–26–36(5) now states that an agency's action may be set aside if its factual findings are *"clearly erroneous* in light of the entire evidence in the record." (emphasis added) Use of the wrong standard of review is not merely harmless error. Utilizing an erroneous legal principle mandates reversal. *McSpadden v. Big Ben Coal Co.,* 288 N.W.2d 181, 185–86 (Iowa 1980); *Nelson v. Cities Service Oil Co.,* 259 Iowa 1209, 1214, 146 N.W.2d 261, 264 (1967).

■ The PUC argues that even if the trial court utilized an incorrect standard of review, this court can affirm the PUC's decision since it is not clearly erroneous in light of the evidence in the record. However, the record does not support the PUC's requirement that NPPD use H-frame towers instead of lattice towers. The PUC based its decision for H-frames on three premises: visual impact, inconvenience to the farmer, and the impact on farmland taken out of production.

While this court will not substitute its judgment for the agency decision, it will reverse when the decision is against the clear weight of the evidence or leaves court with a firm and definite conviction that a mistake has been made. *Fraser v. Water Rights Commission*, Etc., 294 N.W.2d 784, 788 (S.D.1980). We are firmly and definitely convinced that a mistake has been made.

The evidence before the PUC demonstrated that using lattice towers would increase adverse visual impacts for viewers within one mile of the MANDAN Project. Since H-frames would improve visual impact to those who live close to the line, and very few residents live very close to this line, the lattice tower structures are not a significant visual impact to a vast majority of the people in South Dakota. Further, the PUC noted that weed control is the only inconvenience. There was no evidence in the record that weed control is a significant problem with lattice tower structures. Finally, in terms of loss of cropland, H-frame structures would remove between 8.7 and 20.0 acres from production; only 30 acres would be lost from lattice towers. As a result, only some 10.0 to 21.3 more acres would be in production if H-frame towers were utilized.

The PUC exceeded its statutory authority, the circuit court utilized an incorrect standard of review, and the PUC decision is clearly erroneous; therefore the circuit court's decision is reversed. NPPD will be allowed to use lattice towers in the MANDAN Project.

## PUC'S TOPSOIL PRESERVATION PROCEDURE

■ The PUC further required NPPD to abandon its proposed plan of soil restoration and to utilize the PUC's system of removing, stockpiling and replacing topsoil 30 feet from the construction path if NPPD's permit was granted. Once again, the circuit court affirmed this PUC order because it was supported by substantial evidence in the record.

On appeal, NPPD argues that the PUC unlawfully delegated its authority to impose other conditions of soil restoration to landowners, that the circuit court utilized an incorrect standard of review mandating reversal, and that the PUC determination is · clearly erroneous.

The PUC contends that it did not delegate its powers unlawfully. At all times material herein, SDCL 49-1-17 stated in part, "it shall be unlawful for the public utilities commission to delegate any of the powers conferred upon it ... to any other person except in cases where express authority has been given by statute." [2] SDCL 49-41B-24 dictates that the PUC is the only body which can impose terms and conditions. Because no other statute expressly states that landowners can dictate topsoil restoration conditions, the PUC unlawfully delegated its authority.

■ The circuit court's decision must also be reversed because the trial court again utilized an erroneous standard of review, the substantial evidence test. (See the discussion of this issue, *supra*.)

Finally, the circuit court's decision must be reversed, as the PUC decision is clearly erroneous. Once again, the issue before this court is whether the decision is against the clear weight of the evidence or leaves

---

**2.** 1983 S.D.Sess.Laws ch. 15, § 94 amended SDCL 49-1-17 to read:

It is a Class 2 misdemeanor for the public utilities commission to delegate any of the powers conferred upon it, or the performance of the duties imposed upon it by law, to any other person except in cases where express authority has been given by statute.

the court with a firm and definite conviction that a mistake has been made. *Fraser, supra.*

The evidence in the record indicated that both procedures—the PUC's and NPPD's—decrease adverse impact on soil productivity. However, PUC's system contains four more hazards, at an increase of $4 million in cost:

1) The subsoil will become more compacted if topsoil is removed;

2) The stored topsoil is more susceptible to erosion;

3) The trough which will exist after topsoil removal is likely to collect run-off and result in poor drainings; and

4) Unnecessary equipment travel over the land will result when topsoil is removed.

Contrast and balance those hazards with the minimal impact of NPPD's system of soil restoration, which utilizes subsoiling and intensive surface tillage. NPPD's system will result in a statewide loss of $18,300 in agricultural income during the first year after construction ceases and $9,150 during the second year.

Accordingly, we reverse the circuit court's decision affirming the PUC topsoil restoration program involving landowner choice. During oral arguments before this court, NPPD and the PUC agreed that landowners could have a choice of either NPPD's or PUC's system of soil restoration for a period of 30 days. If the landowner does not decide at the end of 30 days, then NPPD will restore the topsoil utilizing its method.

## PUC'S PREEMPTION OF LOCAL LAND USE PROVISIONS

■ Pursuant to SDCL 49–41B–28, NPPD requested the PUC to preempt certain existing and future unreasonably restrictive local land use provisions. The PUC denies this request, reasoning that such a determination was beyond its authority. In reversing and remanding that decision, the circuit court noted that the PUC's refusal to exercise its statutory discretion was arbitrary and capricious and constituted an abuse of discretion.

On appeal, the PUC states that the circuit court's determination of authority and its decision to remand are correct. However, NPPD argues that the circuit court's decision to remand is erroneous and that the PUC order can be modified on appeal since all of the evidence is undisputed. As a result, the only issue is whether we should modify the PUC order on appeal instead of remanding the matter to the PUC for its initial determination.

SDCL 49–41B–28 provides that

A permit ... may supersede or preempt any county ... use, zoning, or building rules, regulations, or ordinances upon a finding by the ... commission that such rules, or regulation, or ordinances, as applied to the proposed route, are unreasonably restrictive in view of existing technology, factors of cost, or economics, or needs of the parties where located in or out of the county or municipality. Without such a finding by the commission, no route shall be designated which violates local land-use zoning, or building rules, or regulations, or ordinances.

The statute clearly designates the PUC as the fact finder before local land use regulations may be preempted or superseded. Because no other agency or court is empowered to make this initial determination, modification of the PUC order, absent an initial finding by the PUC is contrary to the provisions of SDCL 49–41B–28. Therefore, we affirm the circuit court's decision to remand this matter to the PUC for its finding on whether the record supports NPPD's request to preempt or supersede unreasonably restrictive local land use regulations.

## PUC'S GRANT OF A GENERAL VARIANCE

■ The PUC denied NPPD's request for a 120 foot general variance from the precise centerline of the route on the ground that the granting of such a variance is outside the PUC's authority. The

circuit court reversed the PUC's decision and remanded the matter for a determination as to whether the evidence in the record warranted the requested variance.

On appeal, the PUC concedes that the circuit court's determination of its authority and its decision to remand are correct. Once again, NPPD argues that the circuit court's decision to remand is erroneous since the PUC order can be modified on appeal since all of the evidence is undisputed. As a result, the only issue is whether we should remand this issue to the PUC or modify the decision on appeal.

SDCL 49–41B does not specifically designate that the PUC must make a finding concerning the general variance. However, SDCL 49–41B–20 grants the PUC the authority to approve or to disapprove permit applications, including the proposed route. If the application is disapproved, the applicant can revise the route and seek PUC approval. SDCL 49–41B–22.1 through 49–41B–22.2. A fair interpretation of SDCL 49–41B–11(2), 49–41B–22.1 and 49–41B–22.2 leads us to conclude that a permit applicant can obtain a general variance upon a proper evidentiary showing and PUC approval.

SDCL 1–26–36 buttresses the concept that the PUC must initially make a finding of a general variance. It directs that the reviewing courts must give great weight of administrative findings on questions of fact. Because the granting of a general variance is a question of fact subject to initial PUC approval, we must remand the matter to the PUC. Therefore, we affirm the circuit court's decision to remand this issue to the PUC for its finding on the requested general variance.

### PUC'S REQUIREMENT OF NPPD'S ADDITIONAL DEPOSIT

■ In December 1981, the PUC ordered NPPD to deposit $55,963.50 in addition to its initial deposit pursuant to SDCL 49–41B–12. The circuit court ordered the PUC to return the additional deposit, however, holding that the PUC had erred as a matter of law when it interpreted the term

"construction costs." On appeal, the PUC argues that the circuit court's refusal to include finance and interest costs, land acquisition costs, preliminary engineering costs, and administrative and general overhead costs in the term "construction costs" is unreasonably restrictive.

The term "construction costs" is not defined in SDCL Chapter 49–41B. However, the word "construction" is defined as

any clearing of land, excavation, or other action that would affect the environment of the site for each land or rights of way upon or over which a facility may be constructed, but not including activities incident to preliminary engineering or environmental studies[.]

SDCL 49–41B–2(3).

We are persuaded by NPPD's argument that the term "construction" aids in defining "construction costs." In essence, construction means any actions that have a direct physical effect on the construction site. Since finance and interest costs, land acquisition costs, preliminary engineering costs, and administrative and general overhead costs are not actions which have a direct physical effect on the construction site, they are not construction costs within the meaning of SDCL 49–41B–12.

■ Further, statutory interpretation indicates that when specific examples are followed by a general phrase, the general phrase refers to things of the same kind as previously stated. *Harrison v. PPG Industries, Inc.*, 446 U.S. 578, 588, 100 S.Ct. 1889, 1895, 64 L.Ed.2d 525, 534 (1980); *Kelley v. Duling Enterprises, Inc.*, 84 S.D. 427, 433, 172 N.W.2d 727, 730 (1969); *State v. Fairbanks*, 65 S.D. 272, 274, 273 N.W. 188, 189 (1937). In the instant case, the general phrase "or other actions that would affect the environment of the site" is preceded by two specific examples, "clearing of land" and "excavation." As a result, that general phrase refers to things of the same kind, clearing and excavation, and is narrowly interpreted. Therefore, the term "construction costs" does not include finance and interest costs, land acquisition

costs, preliminary engineering costs, and administrative and general overhead costs.

In the alternative, the PUC argues that even if the term "construction costs" is defined on appeal as the circuit court determined, the matter should be remanded to the PUC to recalculate the deposit due to the additional estimated construction costs relating to the new conditions, H-frame towers and topsoil restoration. Inasmuch as both of these conditions are reversed on appeal, remanding this issue to the PUC is unnecessary. Therefore, we affirm the circuit court's order that the PUC return NPPD's additional deposit of $55,963.50, together with interest at the judgment rate.

## PUC'S FINDING OF FACT NUMBER 10

■ Finally, SEA argues that the PUC order should be affirmed. In the event that it is reversed, SEA contends that Finding of Fact Number 10 must be reversed and remanded for a determination by the PUC. Finding of Fact Number 10 states:

The Commission finds that the requirements of SDCL 34A–9, the South Dakota Environmental Protection Act, have been met and all feasible action has been ordered to be taken in the event a permit to construct is granted, to minimize or avoid the environmental problems revealed in the EIS process.

The PUC contends that SEA's argument must be dismissed because the issue was not properly raised on appeal. While SEA acknowledges that the issue was not technically raised at the circuit court level, it argues that the issue surfaced only in light of the circuit court's decision.

This court has stated that issues presented for the first time on appeal cannot be considered. *Jandreau v. Sheesley Plumbing & Heating Co.*, 324 N.W.2d 266 (S.D. 1982). "Since our function is that of review, issues not presented to the trial court are not before us on appeal." *Chipperfield v. Woessner*, 84 S.D. 13, 19, 166 N.W.2d 727, 730 (1969).

After reviewing the record, we concluded that SEA failed to present this issue to the circuit court. As a result, it would be improper for us to consider it on appeal.

## CONCLUSION

Consistent with this opinion, the trial court's judgment is affirmed in part and reversed in part, and the case is remanded to the circuit court for appropriate disposition.

WOLLMAN, DUNN and MORGAN, JJ., concur.

HENDERSON, J., concurs in result.

DAVIS, Circuit Judge, sitting for FOSHEIM, C.J., disqualified.

HENDERSON, Justice (concurring in result).

Although I generally agree with the majority opinion on its treatment of the major issues in this case, I do not subscribe to that part of the decision which invades the decisional authority of the PUC to require the construction of steel pole H-frame transmission towers. It appears the PUC required these type of towers over the lattice towers for several sound reasons. These included that the steel pole H-frame towers would minimize farming problems which lattice type towers would create; the H-frame towers would be more aesthetically acceptable as they would reduce visual impact, not only for those immediately affected, but by the general public who is bound to see these 504 structures stretching across 126 miles of cropland in this state. The PUC was of the opinion that the environment would be less affected by the steel pole H-frame towers and this is a value judgment on the part of the PUC. I would not, on the basis of number of acres removed from production, uphold the PUC on that basis alone but there were other factors, which I have just pointed out, that are of significant importance. There are exhibits in the record which substantiate that weed control is easier with the steel pole H-frame towers. In *Application of Jack Rabbit Lines, Inc.*, 283 N.W.2d 402, 405 (S.D.1979), writing for a unanimous

Court, I stated: "The Commission is deemed to be an administrative tribunal with expertise." I believe that this Court should defer to the Public Utilities Commission as did the trial court in this matter. However, as has been pointed out by the majority opinion, in the specific matter of the H-frame tower issue, the trial court did use an incorrect standard of review.

Lastly, although I concur in the results of this case concerning once again this H-frame tower issue, the decision as to whether this 126-mile line shall consist of steel pole H-frame transmission towers or lattice towers goes directly, in my opinion, to the character, nature, and type of construction. The word "facility design" is an engineering phrase which has a nice ring but does not eliminate the inherent type of superstructure to be used in this massive project. Surely the body with the expertise, elected by the people of this state, has the power, under state statute, to make a decision as to the type of tower which will dot our rural landscape. It was a judgment call, and we judges should not substitute our judgment therefor.