In the Matter of the Complaint of **NORTHERN STATES POWER COMPANY Against Sioux Valley Empire Electric Association for Provision of Electric Service to Myrl and Roy's Paving.**

No. 17793.

Supreme Court of South Dakota.

Argued May 26, 1992.

Decided July 29, 1992.

Alan F. Glover of Denholm, Glover & Britzman, Brookings, for appellant Sioux Valley Empire Elec. Ass'n.

Warren May of May, Adam, Gerdes & Thompson, Pierre, for appellee Northern States Power Co.

Mark Barnett, Atty. Gen., Douglas Eidahl, Asst. Atty. Gen., Pierre, for appellee South Dakota Public Utilities Com'n.

AMUNDSON, Justice.

Sioux Valley Empire Electric Association, Inc. (Sioux Valley) appeals from trial court's order affirming the decision of the Public Utilities Commission (PUC) in favor of Northern States Power Company (NSP). We affirm.

## FACTS

Myrl and Roy's Paving (Company) is a construction company which operates a quarry located in the southeast quarter of Section 27, Township 101 North, Range 48 West, Minnehaha County, South Dakota. The southeast quarter of Section 27 is divided in half by the 16th line. The area designated as the north half of the southeast quarter of Section 27 is NSP's exclusive assigned electric service territory. The area designated as the south half of the southeast quarter of Section 27 is Sioux Valley's exclusive assigned electric service territory. The record indicates that the 16th line, running east and west separating NSP's assigned service area from Sioux Valley's assigned service area, ran through the approximate center of Company's quarry operation. Based on the present location of Company's equipment, the evidence established that fifty-nine percent of the

electric load was to be consumed in NSP's territory, and forty-one percent was to be consumed in Sioux Valley's territory. This establishment of exclusive territory was by agreement between NSP and Sioux Valley dated January 19, 1976, and approved by PUC in accordance with SDCL 49–34A–43.

Company conducts its construction operation through the use of movable machinery and equipment, and the record reveals that at the present time, Company contemplates moving its operation entirely into Sioux Valley's territory at some time in the not too distant future.

In 1985, Sioux Valley constructed a single phase electric distribution line within its assigned service area to provide electricity to an office trailer used by Company's predecessor, Higman Sand and Gravel. Sioux Valley transferred the account to Company in 1989. Company subsequently determined that single phase service was not adequate to operate all of its equipment and thus utilized its own portable oil-fired electric generator to provide the equivalent of three-phase electric service for its equipment.

In August, 1990, Company representatives while shopping for a three-phase power source from a utility, contacted both NSP and Sioux Valley in regards to providing same to the quarry site. NSP made two separate proposals to Company: First, to build four and one-half miles of three-phase at an estimated cost of $216,000 and a minimum annual fee of $60,000 to Company for five years; or, second, to provide service from NSP's site in Rowena, South Dakota. NSP subsequently evaluated the first proposal and determined no annual fee would be necessary. Sioux Valley proposed construction of three-phase service for approximately $57,000, with no annual fee to Company. Company then accepted Sioux Valley's bid and entered into a service agreement with Sioux Valley.

Under the terms of this agreement, Company was to extend a private line from its electrical trailer, which currently is on the 16th line, to a newly constructed transformer in Sioux Valley's territory. Then, instead of using the electrical trailer to distribute electricity to all the machinery in the quarry, Company would distribute all the electricity through the transformer in Sioux Valley's territory. Thus, while all the same equipment and electric needs remained in NSP's territory, Company moved its connection point so all of the electricity would flow through Company's newly constructed private line connected to the newly located transformer in Sioux Valley's territory.

On March 11, 1991, NSP filed a petition with the PUC, alleging that Sioux Valley was rendering electric service to Company in NSP's exclusive territory. Sioux Valley denied NSP's allegations and a contested case hearing was held before the PUC on April 12, 1991. PUC found in favor of NSP and awarded it the exclusive right to serve Company, with Chairman James Burg (Burg) dissenting.

Sioux Valley appealed PUC's decision to trial court. Trial court heard oral arguments on October 3, 1991, and made its ruling from the bench affirming PUC's decision. Sioux Valley appeals.

## ISSUES

1. Whether PUC and trial court erred in finding that Sioux Valley was extending or rendering electric service in NSP's territory?

2. Whether PUC and trial court erred in awarding NSP the exclusive right to serve Company?

## STANDARD OF REVIEW

■■■■ This court reviews the record of administrative agencies in the same manner as the circuit court. SDCL 1–26–37; *Appeal of Hendrickson's Health Care*, 462 N.W.2d 655 (S.D.1990); *Peery v. Department of Agriculture*, 402 N.W.2d 695 (S.D. 1987); *Application of Northwestern Bell Tel. Co.*, 382 N.W.2d 413 (S.D.1986). Since the circuit court affirmed PUC's findings of fact and conclusions of law in their entirety, our review is of the agency's findings and conclusions. *Matter of Midwest Motor Exp., Inc., Bismarck*, 431 N.W.2d 160 (S.D.1988).

Conclusions of law are given no deference on appeal and are freely reviewable. SDCL 1-26-36; *Hendrickson's,* 462 N.W.2d at 656; *Karras v. State, Dept. of Revenue,* 441 N.W.2d 678 (S.D.1989); *Sharp v. Sharp,* 422 N.W.2d 443 (S.D. 1988). Questions of fact, however, are given greater deference. SDCL 1-26-36. This court does not substitute its judgment for PUC's on the weight of evidence pertaining to questions of fact unless PUC's decision is clearly erroneous, or is arbitrary, capricious, or characterized by an abuse of discretion or a clearly unwarranted exercise of discretion. *Finck v. Northwest School Dist. No. 52-3,* 417 N.W.2d 875 (S.D.1988); *Permann v. Dept. of Labor, Unemp. Ins. D.,* 411 N.W.2d 113 (S.D. 1987); *Appeal of Templeton,* 403 N.W.2d 398 (S.D.1987); *Anderson v. Western Dakota Insurors,* 393 N.W.2d 87 (S.D.1986). We will not reverse an agency decision unless we are left with a definite and firm conviction that a mistake has been committed. *Finck,* 417 N.W.2d at 878; *Matter of Midwest,* 431 N.W.2d at 162; *Dakota Harvestore v. S.D. Dept. of Revenue,* 331 N.W.2d 828 (S.D.1983); *Fraser v. Water Rights Commission, Etc.,* 294 N.W.2d 784 (S.D.1980). With these standards of review in mind, we address PUC's findings and conclusions.

## ANALYSIS

### 1. *Extending or Rendering Service*

In its findings of fact, PUC determined the following:

Sioux Valley intends to render electric service, or is rendering electric service, at retail to power the machinery and equipment within the North Half of the Southeast Quarter of Section 27, Township 101 North, Range 48 West, Minnehaha County, South Dakota, which heretofore has been determined by the [PUC] to be an exclusive service area of NSP.

Sioux Valley argues that this finding should be overturned because it is clearly erroneous. Sioux Valley maintains that it

is not extending or rendering service into NSP's territory because it was Company that extended the line into NSP territory, and SDCL 49-34A-42 does not prohibit a *customer* from extending its own lines into another electric utility's territory. SDCL 49-34A-42 provides as follows:

Each electric utility has the exclusive right to provide electric service at retail at each and every location where it is serving a customer as of March 21, 1975, and to each and every present and future customer in its assigned service area. *No electric utility shall render or extend electric service at retail within the assigned service area of another electric utility unless such other electric utility consents thereto in writing and the agreement is approved by the commission consistent with § 49-34A-55.* However, any electric utility may extend its facilities through the assigned service area of another electric utility if the extension is necessary to facilitate the electric utility connecting its facilities or customers within its own assigned service area ... (Emphasis added.)

Thus, Sioux Valley argues that since it was Company that extended the line and Company is not an "electric utility," there is no violation of the statute.

While it is clear from the definition contained at SDCL 49-34A-1 [1] that Company is not an "electric utility," there is nothing in our statutes which defines "render or extend." Thus, as a matter of statutory construction, we must determine whether Sioux Valley's actions caused it to "render or extend" service in NSP's territory within the meaning of SDCL 49-34A-42. This court has previously stated:

A primary rule of statutory construction is that words and phrases be given their plain meaning and effect. *Board of Regents v. Carter,* 89 S.D. 40, 228 N.W.2d 621 (1975); SDCL 2-14-1. Moreover, in construing a statute, our main objective is to ascertain and give effect

---

1. SDCL 49-34A-1(7) provides:
   (7) "Electric utility," any person operating, maintaining or controlling in this state, equip-

ment or facilities for providing electric service to or for the public including facilities owned by a municipality[.]

to the intention of the legislature. *Western Surety Co. v. Mydland,* 85 S.D. 172, 179 N.W.2d 3 (1970). This intent is best ascertainable from the statutory language. Argo Oil Corporation v. Lathrop, *76 S.D. 70, 72 N.W.2d 431 (1955). Norgeot v. State,* 334 N.W.2d 501, 503 (S.D.1983). Further, this court has stated that legislative intent may be derived from language in the statute as well as from other enactments relating to the same subject which may modify or limit the effect of the scope of the statute at issue. *Nelson v. School Bd. of Hill City, S.D.,* 459 N.W.2d 451 (S.D.1990).

Applying these rules to the facts of this case, we believe the PUC and trial court properly concluded Sioux Valley was rendering or extending service in NSP's territory.

The record reveals that under Sioux Valley's arrangement with Company, Sioux Valley would· bring its service to a transformer located in Sioux Valley territory, nearly to the 16th line. Company would then extend its own private line from the transformer into NSP territory. While the record indicates that it is industry practice to treat the point of connection as the point of delivery of service, there is no question that the electricity provided by Sioux Valley will flow into NSP's exclusive service area. Without Sioux Valley's generation and transmission of electricity to its transformer, Company would be unable to provide electricity to its equipment in NSP's territory. Accordingly, it seems clear that since the ultimate provider of the electric service is Sioux Valley, it is the party· rendering or extending the service.

There are no statutes or previous cases which specifically instruct that the manner in which electricity is consumed is a factor for consideration to assess whether a party is rendering or extending service. However, SDCL 49–34A–1(6) defines "Electric service" as "electric service furnished to a customer for *ultimate consumption,* but not including wholesale electric service furnished by an electric utility to another electric utility for resale[.]" (Emphasis added.) In reading SDCL 49–34A–1(6) in conjunction with SDCL 49–34A–42, ultimate consumption may be considered by the PUC as a factor in determining whether a party is rendering or extending electric service. *See Hartpence v. Youth Forestry Camp,* 325 N.W.2d 292 (S.D.1982).

Since the legislature prohibited electric utilities from rendering or extending service in another utility's territory, we think it plain that an electric utility should not be allowed to use a "middle-man," private line, or artificial point of delivery to accomplish the prohibited conduct. Trial court in its oral decision stated:

> I don't believe that Sioux Valley's claim to serve this customer would be well founded in this case because although I do not find that they employed deception in this case, I do believe—and I'm saying this with a smile on my face—they did cleverly use a legal—well artifice may be too strong of a word—legal loophole[.]

We agree with trial court's analysis of the factual scenario, and accordingly hold trial court and PUC correctly concluded Sioux Valley was rendering or extending service within NSP's territory in violation of SDCL 49–34A–42.

■ Sioux Valley additionally suggests that based on the intersection of the 16th line with Company's property, Company should be allowed to choose its electric service provider. We addressed a similar argument in *Willrodt v. Northwestern Public Service Co.,* 281 N.W.2d 65, 72 (S.D. 1979), wherein we stated: " 'An individual has no organic, economic or political right to service by a particular utility merely because he deems it advantageous to himself.' " (Quoting *Storey v. Mayo,* 217 So.2d 304, 307–8 (Fla.1968)).

SDCL ch. 49–34A establishes the means by which electric utilities service various territories within this state. There is nothing in SDCL ch. 49–34A or previous case-law which would allow Company to choose its electric provider and, we conclude in fact, that the method which Sioux Valley and Company employed in this case circumvents SDCL 49–34A–42. Accordingly, we affirm trial court and PUC's determination

that Sioux Valley was rendering or extending service in NSP's territory.

## 2. *Exclusive Service*

■ There is no statutory provision which would allow both NSP and Sioux Valley to service Company; thus, PUC applied a majority load test (MLT) to determine whether NSP or Sioux Valley should serve Company's electrical needs. Sioux Valley argues PUC has no statutory authority which would allow it to adopt the MLT.

PUC is vested with authority to regulate public utilities in this state by SDCL ch. 49–34A. The agreement between NSP and Sioux Valley, which established their exclusive territories, was approved by PUC pursuant to SDCL 49–34A–43, which provides in part as follows:

> ... The Commission shall approve a contract if it finds that the contract will eliminate or avoid unnecessary duplication of facilities, will provide adequate electric service to all areas and customers affected and will promote the efficient and economical use and development of the electric systems of the contracting electric utilities.

PUC therefore was delegated considerable discretion in attaining these laudable statutory goals.[2] Sioux Valley is correct in arguing that there is no specific statute which controls a situation where a customer's property straddles two exclusive service territories. That being the case, PUC was required to establish a policy to be implemented in its regulation of these public utilities in such a factual situation. In performing its delegated duties, PUC employed the MLT as a test to enable it to determine which utility should service a particular customer when there is a contest between providers. The record reflects that under the MLT, the utility which is assigned the territory where the majority of the customers' electric load is, services the customer's entire load. The record also reflects that under the MLT the point of connection must be in the serving utility's territory.

Trial court concluded the policy decision to adopt the MLT in this case was purely within PUC's area of expertise and, therefore, within PUC's discretion. We agree. This court has previously stated that the PUC is deemed to be an administrative tribunal with expertise. *Application of Jack Rabbit Lines, Inc.*, 283 N.W.2d 402 (S.D.1979). Thus, we think it appropriate in a situation such as this where there is no specific statute relating to a unique set of facts or prior decisions, for the PUC to consider, for this court to defer to the PUC's expertise in matters which lie within its particular field of knowledge.

SDCL ch. 49–34A evidences a legislative intent for PUC to have broad inherent authority in matters involving utilities in this state. Giving the appropriate deference to PUC's expertise and special knowledge in the field of electric utilities, we cannot conclude that PUC's determination to adopt the MLT in this case was clearly erroneous. *Finck, supra.*

---

**2.** PUC was obviously cognizant of these goals as evidenced by its following conclusions:

(5) Electric utility customers in South Dakota do not have the right to choose their electrical supplier on the basis of lower rates. Customer preference, if controlling, would defeat the orderly assignment of service areas. If customers were allowed to choose their electric utility, especially large industrial customers like Myrl and Roy's Paving, the remaining customers who have no choice would be required to cover the revenue shortfall through higher electric rates. A customer with a mobile load may, as a practical matter, choose its electric provider if it relocates its equipment to the company's territory of its choice. Further, any customer may relocate its electrical needs and thereby select the elec-

tric company of its choice. However, under the record as established in this case, the majority of Myrl and Roy's electric power is currently consumed in NSP's assigned service area and therefore, NSP has the exclusive right to serve the entire load. The Commission will not speculate as to how Myrl and Roy's load will change in the future and when a majority of the load will be in Sioux Valley's assigned area.

....

(7) To allow both utilities to serve the customer's respective load on their side of the line would lead to unnecessary duplication of facilities, and would be an inefficient and uneconomical use of the electrical systems of the two companies. SDCL 49–34A–43 and 49–34A–44 prohibit such a result.

We feel constrained to point out what we have not held. This decision does not hold that the MLT test is required in every contested territorial case. PUC may conclude under a different set of facts that a different test, such as point of use test or point of delivery test, is more appropriate for consideration and application to a subsequent case. We are simply holding that under the facts of this case, PUC did not err or abuse its discretion in using the MLT test. Accordingly, the decision of the trial court and PUC to award NSP exclusive service is affirmed.

MILLER, C.J., and WUEST, HENDERSON and SABERS, JJ., concur.