#27324-a-SLZ

**2015 S.D. 81**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

GERALD PESALL,                                        Intervener and Appellant,

    v.

MONTANA DAKOTA UTILITIES, CO.,
OTTER TAIL POWER and
THE SOUTH DAKOTA PUBLIC
UTILITIES COMMISSION,                                Appellees,

    and

SCHURING FARMS, INC. and
BRADLEY MOREHOUSE,                                   Interveners.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIFTH JUDICIAL CIRCUIT
DAY COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE SCOTT P. MYREN
Judge

* * * *

N. BOB PESALL
Flandreau, South Dakota                              Attorney for intervener
                                                     and appellant.


* * * *

CONSIDERED ON BRIEFS
ON AUGUST 31, 2015

OPINION FILED **11/04/15**

THOMAS J. WELK
JASON R. SUTTON of
Boyce Law Firm, LLP
Sioux Falls, South Dakota

Attorneys for appellees
Montana Dakota Utilities Co.
and Otter Tail Power.


MARTY J. JACKLEY
Attorney General

JOHN J. SMITH
KAREN E. CREMER
Special Assistant Attorneys General
South Dakota Public Utilities Commission
Pierre, South Dakota

Attorneys for appellee the
South Dakota Public Utilities
Commission.

#27324

ZINTER, Justice

[¶1.]     Montana Dakota Utilities Co. and Otter Tail Power Company (Applicants) filed an application with the South Dakota Public Utilities Commission (PUC or Commission) for a permit to construct a high-voltage electrical transmission line. Appellant Gerald Pesall objected to the project because he was concerned that excavating and moving soil to construct the project might unearth and spread a crop parasite. The PUC granted the permit on conditions, including a condition to identify and mitigate the potential parasite problem. The circuit court affirmed. Pesall's appeal raises two issues: whether the permit condition relating to the parasites constituted an improper delegation of authority to a private party; and, whether the PUC exceeded a twelve-month time limit for rendering complete findings on the application. We affirm.

*Facts and Procedural History*

[¶2.]     On August 23, 2013, Applicants applied for a permit to construct a 345-kilovolt transmission line that would start near Ellendale, North Dakota; would run through Brown, Day, and Grant counties in South Dakota; and would terminate near Big Stone City. The construction involved the suspension of high-voltage electrical lines from steel monopole towers. Each tower would be approximately 120 to 155 feet in height. The towers were to be attached to cylindrical concrete foundations, six to eleven feet in diameter and twenty-five to thirty feet deep. Construction required the removal and disposal of approximately thirty cubic yards of soil for each tower.

[¶3.] Applicants' project would cross one part of Pesall's farm. Pesall intervened and was granted party status.[1] In a subsequent contested-case hearing, Dr. Gregory Tylka, one of Pesall's witnesses, testified about soybean cyst nematodes (SCNs). He testified that SCNs are soil-born parasites that can decrease soybean productivity in infected fields. SCNs may exist in soil at depths of six feet, and they may remain dormant for ten years. SCNs have been found in three of the counties through which the transmission line would traverse. SCNs can spread by any activity that moves soil. There is no dispute that the construction necessary to build the proposed line could spread the parasite. However, wind, water erosion, burns, typical farming practices, and even people walking over infected soil can also spread SCNs. Furthermore, there was no evidence that SCNs infected any soil along the project route.

[¶4.] Before the evidentiary hearing, Applicants and PUC staff submitted a proposed settlement stipulation that would subject the permit to thirty-three conditions. One condition addressed SCN mitigation. Condition 17 provided: "Applicant shall develop and implement a mitigation plan to minimize the spread of [SCNs] . . . in consultation with a crop pest control expert." Pesall objected to the proposed condition at the evidentiary hearing.

[¶5.] Following the hearing, PUC staff and Applicants entered into an amended settlement stipulation that further addressed SCN mitigation. Pesall also objected to this proposal. He did not, however, propose an alternative mitigation

---

1. Other parties/landowners also intervened, but they are not parties in this appeal.

plan. Instead, he requested that the PUC deny the permit on grounds relating to SCN mitigation, require the Applicants to reapply within three years, and limit the reconsideration to SCN mitigation. The PUC acknowledged Pesall's concerns, but denied his request. The PUC found that the risk of spreading SCNs from the project was not a serious threat. Additionally, in rendering its final decision to grant the permit, the PUC modified Condition 17 to require PUC oversight of any required SCN mitigation. Modified Condition 17 provided:

> After Applicants have finished the soil sample field assessment in accordance with the specifications for such assessment prepared in consultation with an expert in the proper methodology for performing such a sampling survey, Applicants shall submit to the Commission a summary report of the results of the field assessment and Applicants' specific mitigation plans for minimizing the risk of the spread of soybean cyst nematode from contaminated locations to uncontaminated locations. At such time and throughout the construction period, one or more Commissioners or Staff shall have the right to request of Applicants confidential access to the survey results to enable verification of the survey results, assess the appropriateness of the mitigation measures to address such results, and monitor the execution of the plan during construction.

The PUC ultimately found that Applicants' SCN mitigation plan, together with modified Condition 17, would reasonably minimize the risk of spreading SCNs. The PUC entered a written Final Decision and Order granting the permit subject to this and other conditions.

[¶6.] Pesall appealed to the circuit court raising six issues. The circuit court affirmed. Pesall now appeals to this Court raising two issues: (1) whether the PUC improperly delegated its authority to a private party; and (2) whether the PUC exceeded a statutory twelve-month time limit for issuing complete findings. Pesall's arguments raise questions of law and statutory interpretation. "[Q]uestions of law,

including statutory interpretation, are reviewed de novo." *In re Establishment of Switched Access Rates for U.S. W. Commc'ns, Inc.*, 2000 S.D. 140, ¶ 13, 618 N.W.2d 847, 851.

*Decision*

[¶7.] A permit is required to construct the type of electrical transmission line at issue in this case. *See* SDCL 49-41B-4. The Legislature conferred the authority to grant or deny these permits on the PUC. *Id.*

[¶8.] Pesall first argues that the PUC should have rejected Applicants' application because their mitigation proposal did not state with specificity what Applicants would do to mitigate the spread of SCNs; what Applicants would do with potentially contaminated soil; and how Applicants would prevent contaminated soil from being transported by equipment from one field to another. Pesall argues that the PUC should have required Applicants to correct these alleged defects and reapply within three years. *See* SDCL 49-41B-22.1 (authorizing this procedure).[2]

---

2.  SDCL 49-41B-22.1 provides:

> Nothing contained herein shall prohibit an applicant from reapplying for a permit previously denied pursuant to § 49-41B-24 or 49-41B-25 within three years from the date of the denial of the original permit. Upon the first such reapplication, the applicant shall have the burden of proof to establish only those criteria upon which the original permit was denied, provided that nothing in the reapplication materially changes the information presented in the original application regarding those criteria upon which the original permit was not denied. However, nothing contained in this provision shall prohibit the Public Utilities Commission from requiring such applicant to meet its burden of proof as to any criteria, upon a specific finding by the commission of a material change in the circumstances regarding those criteria, but the Public Utilities
>
> (continued . . .)

Although this was an alternative for the PUC, the PUC chose to grant the permit subject to SCN mitigation conditions. The Legislature expressly authorized the PUC's choice, *see* SDCL 49-41B-24,[3] and we give "deference to PUC's expertise and special knowledge in the field of electric utilities," *Matter of N. States Power Co.*, 489 N.W.2d 365, 370 (S.D. 1992). Pesall has not demonstrated an error of law or an abuse of discretion in the PUC's decision to grant a conditional permit rather than requiring reapplication.

[¶9.] Pesall next argues that modified Condition 17 improperly delegated the PUC's authority to a private party. Pesall relies on *In re Nebraska Power District*, 354 N.W.2d 713 (S.D. 1984).

[¶10.] In *Nebraska Power District,* the Nebraska Public Power District (NPPD) applied for a permit to construct an electrical transmission facility. *Id.* at 715. Certain affected landowners had concerns about the soil handling procedures to be used in the project. *See id.* at 716. In response, the PUC conditioned the permit on a requirement that NPPD offer soil treatment options to the affected landowners. *Id.* The options allowed the landowners to "require that NPPD utilize

---

(. . . continued)
Commission shall not, in any event, prepare or require the preparation of an environmental impact statement.

3. SDCL 49-41B-24 provides:

Within twelve months of receipt of the initial application for a permit for the construction of energy conversion facilities, AC/DC conversion facilities, or transmission facilities, the commission shall make complete findings in rendering a decision regarding whether a permit should be granted, denied, or granted upon such terms, conditions or modifications of the construction, operation, or maintenance as the commission deems appropriate.

other specified topsoil preservation procedures on their land." *Id.* We concluded, "SDCL 49-41B-24 dictates that the PUC is the only body which can impose terms and conditions. Because no other statute expressly states that landowners can dictate topsoil restoration conditions, the PUC had unlawfully delegated its authority." *Id.* at 719.

[¶11.] *Nebraska Power District* does not, however, apply in this case. In *Nebraska Power District*, the private parties "could, if they desired, require that NPPD utilize other specified topsoil preservation procedures on their land." *Id.* at 716. We acknowledge that the PUC specified other procedures. Nevertheless, this Court characterized the topsoil restoration program as a matter involving private party "choice." *Id.* at 720. In this case, the Applicants may not choose the mitigation procedure because the PUC retained oversight authority to make the ultimate decision. Consequently, *Nebraska Power District* is no support for the proposition that the PUC delegated its authority to the Applicants.[4]

[¶12.] On the contrary, the permit and the PUC's modifications of Condition 17 reflect that the PUC retained its authority to make the ultimate decision regarding SCN mitigation. There is no dispute that the PUC itself granted the permit and imposed the mitigation conditions. Concededly, modified Condition 17 does not include a specific mitigation plan, but the condition requires Applicants to

4. Pesall also relies on two federal cases. *See Ass'n of Am. R.Rs. v. U.S. Dep't of Transp.,* 721 F.3d 666 (D.C. Cir. 2013), *vacated on other grounds sub nom. Dep't of Transp. v. Ass'n of Am. R.Rs.,* ___ U.S. ___, 135 S. Ct. 1225, 191 L. Ed. 2d 153 (2015); and *Carter v. Carter Coal Co.,* 298 U.S. 238, 269, 56 S. Ct. 855, 858, 80 L. Ed. 1160 (1936). These cases are inapposite because they involved private actors exercising regulatory authority over other private actors.

conduct a field assessment to determine if SCNs contaminate the soil. Additionally, Applicants must consult an expert to ensure their field assessment follows a proper methodology. Then, the permit condition requires Applicants to submit the field assessment and a specific mitigation plan to the PUC for a sufficiency review. Finally, under the permit condition, the PUC must verify the survey results, assess the appropriateness of the mitigation measures, and monitor execution of the mitigation plan during construction. Thus, although the PUC did not specify a precise pre-construction mitigation plan, if SCNs are encountered during construction, Applicants do not have the ultimate authority to choose the final mitigation plan. Modified Condition 17 requires the PUC to oversee and determine the actual mitigation requirements in light of the variables that will be encountered in construction.[5] As the PUC indicated in its findings of fact, Condition 17 was modified to provide "clarity concerning exactly what process [Applicants] would follow in the SCN soil assessment[,] . . . mitigation plan development[,] [mitigation plan] execution[,] and [the PUC's] ability to verify and exercise *its oversite authority* over the development and execution during construction." (Emphasis added.) We

---

5. Applicants' mitigation plan explained the dilemma:

> Mitigating the spread of SCN from an existing affected field to a non-SCN affected field, a variety of measures may be utilized, which are dependent on soil conditions, weather conditions, topography, distance traveled, equipment type, and cost. Unfortunately, one mitigation measure alone is not a "catch-all" and will be determined on a site-specific basis. Measures to assist in the control of soils on equipment may include: cleaning stations, utilizing clean crews for non-affected fields and a dirty crew for affected fields, equipment mats, and weather-dependent construction (i.e. frozen and dry soils). The measures ultimately used will depend on the results of the sampling effort, cost, resource availability, and contractor input.

conclude that modified Condition 17 did not delegate the PUC's authority to the Applicants.[6]

[¶13.] Pesall also argues that the PUC did not issue complete findings on the permit within twelve months as required by SDCL 49-41B-24. Pesall points out that the PUC did not order a specific mitigation plan within a year after the application was filed. Pesall contends that the PUC lacks authority to act after that twelve-month deadline. The implication is that SDCL 49-41B-24 was violated because the PUC made no specific finding on the ultimate mitigation plan that would be implemented.

[¶14.] Applicants filed their application on August 23, 2013. On August 22, 2014, the PUC issued its Final Decision and Order. Detailed findings and modified Condition 17 were included in the Final Decision and Order. Therefore, the PUC timely rendered a decision granting the permit on conditions and included detailed findings. We acknowledge Pesall's point that specific mitigation plans are not included: modified Condition 17 contemplates future action after the one-year deadline. However, as previously noted, the future action involves PUC *enforcement* of modified Condition 17. The fact that the PUC retained jurisdiction to enforce its conditions does not mean they failed to render complete findings on the permit. SDCL 49-41B-33 authorizes future enforcement of conditions: "A permit may be revoked or suspended by [the PUC] for . . . [f]ailure to comply with the terms or conditions of the permit[.]" *See also In re Otter Tail Power Co. ex rel.*

---

6. Pesall also advances three policy considerations for not allowing the PUC to delegate its authority. We do not address those concerns because the PUC did not unlawfully delegate authority to a private party.

*Big Stone II*, 2008 S.D. 5, ¶ 33, 744 N.W.2d 594, 604 (upholding a similar forward-looking enforcement provision in a case where the permit required "that the Applicants submit annual reviews of any regulations on CO2 emissions and their efforts to comply with those regulations"). Enforcement of conditions is often necessary in these types of cases. Pesall's contrary suggestion is unsupported by the nature of the project and the PUC's statutory authority.

[¶15.] The PUC did not delegate its regulatory authority to Applicants, and the PUC timely rendered complete findings on the permit application. We affirm.

[¶16.] GILBERTSON, Chief Justice, and SEVERSON, WILBUR, and KERN, Justices, concur.