#24485-a-JKK
**2008 SD 5**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

IN THE MATTER OF OTTER TAIL POWER
COMPANY ON BEHALF OF BIG STONE II
CO-OWNERS FOR AN ENERGY CONVERSION
FACILITY PERMIT FOR THE CONSTRUCTION
OF THE BIG STONE II PROJECT

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE LORI S. WILBUR
Judge

\* \* \* \*

JANETTE K. BRIMMER of
Minnesota Center For
Environmental Advocacy                    Attorneys for appellants
St. Paul, Minnesota                       Fresh Energy, Izaak Walton
                                          League of America-Midwest
JOHN H. DAVIDSON                          Office, Union of Concerned
Vermillion, South Dakota                  Scientists & Minnesota Center
                                          for Environmental Advocacy.


THOMAS J. WELK
CHRISTOPHER W. MADSEN of
Boyce, Greenfield, Pashby & Welk          Attorneys for appellee
Sioux Falls, South Dakota                 Big Stone II Co-Owners.

JOHN J. SMITH
Assistant Attorney General
SD Public Utilities Commission            Attorneys for appellee
Pierre, South Dakota                      SD Public Utilities Commission.

\* \* \* \*

ARGUED ON NOVEMBER 7, 2007

OPINION FILED **01/16/08**

#24485

KONENKAMP, Justice

[¶1.]	Otter Tail Power Company, on behalf of several utilities, applied for a permit to construct Big Stone II, a coal-fired energy conversion facility. Certain non-profit environmental organizations intervened to oppose the application. They asserted that the carbon dioxide ($CO_2$) emissions from Big Stone II would contribute to global warming, thereby posing a threat of serious environmental injury. The South Dakota Public Utilities Commission (PUC) concluded that although the facility will emit $CO_2$, the amount will not pose a threat of *serious* injury to the environment. It found that $CO_2$ emissions are not currently regulated by Congress or South Dakota and that Big Stone II would only increase the national amount of emissions by seven hundredths of one percent. Because the PUC followed existing legal guidelines in approving the permit, and its findings were not clearly erroneous, we uphold its decision.

## Background

[¶2.]	The South Dakota Legislature acknowledged the significant impact energy development has on "the welfare of the population, the environmental quality, the location and growth of industry, and the use of the natural resources of the state." SDCL 49-41B-1. It enacted legislation to "ensure that [energy conversion and transmission] facilities are constructed in an orderly and timely manner so that the energy requirements of the people of the state are fulfilled." *Id.* The Legislature deemed it "necessary to ensure that the location, construction, and operation of facilities will produce minimal adverse effects on the environment and upon the citizens of this state by providing that a facility may not be constructed or

-1-

operated in this state without first obtaining a permit from the [PUC]." *Id*; SDCL

49-41B-4.

[¶3.]        A permit application must include:

> (1) The name and address of the applicant;
> (2) Description of the nature and location of the facility;
> (3) Estimated date of commencement of construction and duration of construction;
> (4) Estimated number of employees employed at the site of the facility during the construction phase and during the operating life of the facility.  Estimates shall include the number of employees who are to be utilized but who do not currently reside within the area to be affected by the facility;
> (5) Future additions and modifications to the facility which the applicant may wish to be approved in the permit;
> (6) A statement of the reasons for the selection of the proposed location;
> (7) Person owning the proposed facility and person managing the proposed facility;
> (8) The purpose of the facility;
> (9) Estimated consumer demand and estimated future energy needs of those consumers to be directly served by the facility;
> (10) The potential short and long range demands on any estimated tax revenues generated by the facility for the extension or expansion of public services within the affected areas;
> (11) Environmental studies prepared relative to the facility;
> (12) Estimated construction cost of the facility.

SDCL 49-41B-11.

[¶4.]        After a request for a permit is filed, the PUC must enlist a local review

committee, which "shall meet to assess the extent of the potential social and

economic effect to be generated by the proposed facility, to assess the affected area's

capacity to absorb those effects at various stages of construction, and formulate

mitigation measures."  SDCL 49-41B-7.  This committee issues a final report to the

PUC with its findings and "recommendations of the committee as to mitigation

measures and minority reports."  SDCL 49-41B-10.  The PUC may also "prepare or

require the preparation of an environmental impact statement[.]" SDCL 49-41B-21. An applicant is required "to establish that: (1) The proposed facility will comply with all applicable laws and rules; (2) The facility will not pose a threat of serious injury to the environment nor to the social and economic condition of inhabitants or expected inhabitants in the siting area; (3) The facility will not substantially impair the health, safety or welfare of the inhabitants; and (4) The facility will not unduly interfere with the orderly development of the region with due consideration having been given the views of governing bodies of affected local units of government." SDCL 49-41B-22.

[¶5.] On November 8, 2004, in accord with SDCL 49-41B-5, the Otter Tail Corporation, doing business as Otter Tail Power Company, submitted a proposal to the PUC for permission to construct an energy conversion facility. Otter Tail submitted the proposal on behalf of Central Minnesota Municipal Power Agency, Great River Energy, Heartland Consumers Power District, Montana-Dakota Utilities Company, a division of MDU Resources Group, Inc., Southern Minnesota Municipal Power Agency, and Western Minnesota Municipal Power Agency (Applicants).[1] As proposed, the facility would be a 600 megawatt (MW) coal-fired electric generating plant to be located in Grant County, South Dakota, east of

---

1. As confirmed by counsel at oral argument, some utilities have since pulled out of the project. Otter Tail and Montana-Dakota Utilities Company indicate that they will proceed with a smaller facility.

Milbank and Northwest of Big Stone.[2] The facility would be named Big Stone II and be situated next to an older facility, Big Stone I.

[¶6.] Several organizations sought to intervene: Clean Water Action; South Dakota Chapter Sierra Club; Union of Concerned Scientists; Mary Jo Stueve; Minnesotans for an Energy-Efficient Economy; Izaak Walton League of America, Midwest Office; and Minnesota Center for Environmental Advocacy (Intervenors). The Intervenors opposed the application on multiple grounds related to the environmental impact of Big Stone II. The PUC granted intervention to all parties.[3]

[¶7.] The Applicants' petition to the PUC triggered SDCL 49-41B-6, and a local review committee was established to prepare a social and economic assessment of Big Stone II. The assessment (1) examined the potential impacts of Big Stone II; (2) addressed the area's ability to absorb those impacts; (3) identified a list of actions needed to ensure a smooth project; and (4) prepared a list of recommended mitigation measures. The committee's findings relate to issues not implicated in this appeal, and therefore, will not be discussed.

---

2. In 1972, various electrical utilities and other electrical industry participants voluntarily joined Mid-Continent Area Power Pool (MAPP), an association organized to promote efficiency and reliability in the industry by pooling power generation and transmission. MAPP noted that by the summer of 2011, the MAPP United States region would have an 819 megawatt deficit. To alleviate the forecasted deficit, MAPP concluded that members would need to construct power generators, purchase additional capacity, and/or reduce the growth in demand.

3. Clean Water Action and the Sierra Club later withdrew.

[¶8.]     An environmental impact statement was also prepared. Among many other things, the impact statement assessed the air quality effects of Big Stone II. In so doing, the statement first identified the applicable regulations, stating

> The Clean Air Act, and its amendments (CAA), requires the Federal U.S. Environmental Protection Agency (USEPA) to set National Ambient Air Quality Standard (NAAQS) for pollutants considered harmful to public health and the environment. . . . The USEPA Office of Air Quality Planning and Standards has set NAAQS for six principal pollutants, which are called 'criteria' pollutants.[4]

Draft Environmental Impact Statement May 2006 at 3-1, 3-2. The statement also recognized applicable regulations from Prevention of Significant Deterioration (PSD), New Source Performance Standards (NSPS), Best Available Control Technology (BACT), and the Clean Air Mercury Rule (CAMR). *Id.* at 4-2.

[¶9.]     Although $CO_2$ is not regulated, the statement recognized that Big Stone II was estimated to emit approximately 4.7 million tons of $CO_2$ per year. It remarked, however, that "[p]rojected emissions of all hazardous air pollutants from the existing and proposed plants would be reduced by approximately 41 [million] tons/year (from approximately 63 [million] tons/year by the existing plant to approximately 22 [million] tons/year by the combined existing and proposed plant operations)." *Id.* at ES-18. Moreover, the statement noted that "[t]he proposed super-critical combustion technology for the proposed Project is three-to-four percent more efficient, and would result in lower $CO_2$ emissions per MWh

---

4.     These include: carbon monoxide (CO), lead, nitrogen dioxide, two types of particulate matter, ozone, and sulfur dioxides.

[megawatt hours] of electrical energy output as compared to the sub-critical boiler technology." *Id.* at 4-11.

[¶10.]     The statement summarized the air quality effects of Big Stone II:

> Overall, no air quality impacts exceed significance criteria for air resources. The long-term impacts from the proposed Project for NAAQS and PSD increment would be less than significant. The Grant County, South Dakota area is in attainment or is unclassifiable for all criteria pollutants. Emissions from the proposed project would not conflict with or obstruct implementation of any applicable air quality plan. Since the increase in criteria pollutant emissions would either be less than the PSD significance levels or well within the NAAQS and PSD increments, the proposed Project long-term and short-term emissions impacts on distant air quality areas that are not in compliance with NAAQS is unlikely. In addition, visibility impacts to Class I and Class II areas would be less than significant. . . .

*Id.* at 4-13. Nevertheless, according to the statement, "[t]he proposed Big Stone II plant would generate unavoidable emissions of air pollutants that would be an adverse impact." *Id.* at 5-1. This was determined notwithstanding that Big Stone II "would operate under [an] appropriate air emission permit from the state of South Dakota that requires operation of the plant under regulatory limits. . . . Even with the permit requirements and air emission control equipment, these impacts would be adverse and unavoidable." *Id.*

[¶11.]     In accord with SDCL 49-41B-16, the PUC is required to hold a public hearing near the proposed facility's location. Two public hearings were held. At the first hearing, fifteen people provided testimony. At the second hearing, twenty people attended, with twelve giving testimony. In addition to the public hearings, the Applicants, Intervenors, and the PUC exchanged substantial written discovery, with the Applicants answering more than 500 discovery requests and making

available more than 47,000 pages of documents. All parties submitted pre-filed testimony and a formal evidentiary hearing was held on June 26-29, 2006. Oral argument was heard by the PUC on July 11, 2006.

[¶12.] Through their testimony, the Applicants asserted that Big Stone II would provide the energy necessary to serve consumers in South Dakota, North Dakota, Minnesota, Iowa, Montana, and Wisconsin. Big Stone II is projected to produce 4.6 million MW hours of electricity per year. The estimated cost to construct Big Stone II is $1 billion in 2011 dollars. The Applicants claimed that if construction of Big Stone II was delayed or prohibited, the member companies would not be able to generate sufficient energy, which would affect the reliability of their systems and harm consumers.

[¶13.] The Intervenors opposed construction of Big Stone II. They asserted that Big Stone II would pose a threat of serious injury to the environment under SDCL 49-41B-22 and should not be constructed. The threat of serious injury, the Intervenors alleged, would be caused by the amount of $CO_2$ Big Stone II would emit. These emissions, according to the Intervenors, would contribute to global warming, which they contend seriously harms the environment.

[¶14.] To support their contention that global warming harms the environment and $CO_2$ emissions contribute to global warming, the Intervenors submitted expert testimony from Dr. Ezra Hausman. Dr. Hausman is employed with Synapse Energy Economic, Inc., a company specializing in energy and environmental concerns. Dr. Hausman holds a Ph.D. in Atmospheric Science from

Harvard University, a master's degree in Applied Physics from Harvard, and a master's degree in Water Resource Engineering from Tufts University.

[¶15.]    Dr. Hausman testified that "[h]uman induced climate change is a grave and increasing threat to the environment and to human societies around the globe." According to Dr. Hausman, an increase in many greenhouse gases has caused a 0.6° C increase in global temperature in the twentieth century. More notably, he opined, "This means that the planet as a whole does not lose heat to space as efficiently as it otherwise would, so the system as a whole is warming up. This is the phenomenon commonly referred to as 'global warming.'"

[¶16.]    According to Dr. Hausman, the increase in global temperature "has come primarily from the burning of fossil fuels (coal, oil, and natural gas), and also from changes in land use such as deforestation." Of the fossil fuels, he stated that "coal emits the most $CO_2$ per unit of energy obtained." Dr. Hausman said that "[t]here is an unequivocal scientific consensus on many aspects of the issue of global climate change." Specifically, according to Dr. Hausman, there is a consensus that:

> (1) "the $CO_2$ content of the atmosphere is increasing rapidly;"
> (2) "this rate of increase, and resulting abundance of $CO_2$ in the atmosphere, is unprecedented in at least the past 200,000 years and probably much longer;"
> (3) "the primary source of the increase is the combustion of fossil fuels by human industrialized societies, i.e., that is the anthropogenic $CO_2$;"[5]
> (4) "the increased abundance of $CO_2$ has a direct radiative forcing effect on climate by altering the heat transfer characteristics of the atmosphere;"
> (5) "this change in the heat transfer properties of the atmosphere will have an impact on the climate of the planet;"

---

5.    According to Dr. Hausman, the term "anthropogenic" refers to human caused emissions of $CO_2$.

(6) "the climate of the earth is currently changing in ways that are consistent with model predictions based on the increased radiative forcing due to the anthropogenic increase in the atmospheric $CO_2$[;]"
(7) "the magnitude of climate impacts will increase with increasing atmospheric $CO_2$ content;" and
(8) "once the atmospheric abundance of $CO_2$ has been increased, it will only return to equilibrium levels through natural processes on a timescale of several centuries."

[¶17.]     In regard to coal-fired power plants in general, Dr. Hausman testified that the ones "in the United States already emit almost one-third of the U.S. emissions, or 8% of all the world's anthropogenic $CO_2$ into the atmosphere, a staggering contribution to the global buildup of greenhouse gases." Moreover, he testified that because "base load coal plants in the United States are built to produce electricity for decades, as long as 70 years in the case of some of the older plants still operating today", the threat to the environment "is becoming increasingly obvious and severe."

[¶18.]     With respect to Big Stone II, Dr. Hausman testified that it would "add over 4.5 million tons of $CO_2$ to the atmosphere every year of its operational life, inexorably and significantly contributing to the buildup of greenhouse gases in the atmosphere." This amount represents a 34% increase in South Dakota's emission record from the EPA in 2001. Further, he said that "[a]t 4.5 million tons per year, emissions from Big Stone II would be equivalent to emissions from almost 670,000 cars." The emissions from Big Stone II, Dr. Hausman explained, "would cause irreversible damage to the environment, especially considering its expected lifetime of 50 years or more and the slow recovery time for atmospheric $CO_2$." He stated, "Human societies and ecosystems will find themselves poorly adapted to their local climate and this will result in disruption of ecosystems[.]" He also predicted that

the warming in a region like South Dakota will cause increased temperatures in the summer, resulting in more droughts and reduced crop yields.

[¶19.]     He concluded that the emissions from Big Stone II will cause "a significant and irreversible impact on the environment, both globally and in South Dakota. . . . My opinion is that this facility will have a cumulative effect, in combination with other operating energy conversion facilities, both existing and under construction, of causing the level of atmospheric carbon dioxide to be significantly elevated relative to what it would be without this plant. . . . In my opinion, the environmental effects of this facility will pose a threat of serious injury to the environment in South Dakota and in the broader region."

[¶20.]     In response to Dr. Hausman's testimony, the Applicants presented the rebuttal testimony of Ward Uggerud, Otter Tail's senior vice-president. Uggerud testified that Dr. Hausman's opinion that Big Stone II will have a significant adverse impact on South Dakota "lacks perspective, to say the least." Although he conceded that "Big Stone II will emit approximately 4.7 million short tons of carbon dioxide per year," Uggerud explained:

> The Energy Information Administration (EIA) reports that U.S. anthropogenic carbon dioxide emissions for 2010 are projected to be 6,365 million metric tons. . . . This means that Big Stone II's share of total U.S. anthropogenic carbon dioxide emissions in 2010 (assuming the plant came on line then) would be 0.0007 (0.07%, or seven hundredths of one percent). According to EIA, global anthropogenic $CO_2$ emissions in 2010 will be 30,005 million metric tons. Big Stone II's share of this amount will be 0.00014 (0.014% or less than two one-hundredths of one percent).

Moreover, Uggerud asserted that "[c]arbon dioxide is not the only greenhouse gas. Other gasses, such as methane and water vapor, also trap heat in the atmosphere.

Water vapor is by far the most dominant greenhouse gas." He thought, therefore, that "the evidence is simply insufficient to conclude that $CO_2$ emissions associated with the proposed Big Stone II will cause [a] 'costly adverse impact on the environment both in South Dakota and throughout the region, the continent and the planet.'"

[¶21.]     After considering Dr. Hausman's and Uggerud's testimony and the voluminous record, the PUC issued a thirty-four page letter decision, which, among other things, identified the applicable rules and regulations, the site description, alternative locations, and the impact of the plant on the environment. It also evaluated the regulatory and environmental costs associated with construction of Big Stone II. The PUC found that Big Stone II complied with all rules and regulations under SDCL Chapter 49-41B and ARSD Chapter 20:10:22. As for alternative energy sources, the PUC considered a study submitted by the Applicants from Burns & McDonnell Engineering Co. It examined alternative baseload generation technologies, such as wind, biomass, hydropower, solar, landfill gas, geothermal energy, distributed generation, atmospheric circulating fluidized bed, combined cycle natural gas turbine, and integrated coal gasification combined cycle. The PUC concluded that "there were no renewable generation options available to address the need for 600 MW of baseload power within the timeframe required, and that other fossil fuel sources were more expensive and less desirable." Further, according to the PUC, there was no single next best alternative source where the Applicants could obtain the needed energy and the "Intervenors have not

proposed an alternative to provide base load capacity through natural gas or oil instead of coal" and "have not suggested any specific alternative to Big Stone II. . . ."

[¶22.]     The PUC also addressed an issue that arose at the hearing where the Intervenors argued that the Applicants should pay the costs associated with possible future regulation of $CO_2$ emissions.  Because neither Congress nor South Dakota has regulated $CO_2$ emissions, and the PUC found it speculative whether such regulations would be established, it concluded that imposing costs would be unwarranted.

[¶23.]     The PUC considered the environmental impact statement filed by the Applicants.  The statement indicated that Big Stone II would emit approximately 4.7 million tons of $CO_2$ each year and over 225 million tons of $CO_2$ over the expected life of the plant.  But the plant would "produce about 18% less $CO_2$ than other existing coal-fired plants because the super-critical boiler proposed here is more efficient than other forms of coal-fired technologies."  Thus, the PUC found that Big Stone II "will not contribute materially to the increase in the production of anthropogenic carbon dioxide[.]"  The PUC also found that Big Stone II "would increase U.S. emissions of carbon dioxide by approximately .0007, or seven-hundredths of one percent[.]"

[¶24.]     In sum, considering the voluminous record, including the pre-filed testimony, the committee report, the environmental impact statement, and the applicable rules and regulations, the PUC concluded that "if constructed in accordance with the terms and conditions" set forth in its decision, Big Stone II "will

not pose a threat of serious injury to the environment or to the social and economic conditions of the inhabitants or expected inhabitants in the siting area."

[¶25.] Accordingly, the PUC granted the Applicants a permit to construct Big Stone II in compliance with the terms and conditions of the PUC's decision. In circuit court, the Intervenors' appeal was affirmed. They now appeal to this Court asserting that the PUC's decision (1) violated the plain language of SDCL 49-41B-22; and (2) was clearly erroneous in light of the evidence as a whole.

## Standard of Review

[¶26.] Our review of the PUC's decision granting the Applicant's request for a permit to construct Big Stone II is controlled by SDCL 1-26-36. *See* Tebben v. Gil Haugen Const., Inc., 2007 SD 18, ¶15, 729 NW2d 166, 171 (quoting Wells v. Howe Heating & Plumbing, Inc., 2004 SD 37, ¶9, 677 NW2d 586, 590 (quoting SDCL 1-26-36)). The PUC's findings of fact are reviewed under the clearly erroneous standard, while its conclusions of law are reviewed de novo. *See id.* "A reviewing court must consider the evidence in its totality and set the [PUC's] findings aside if the court is definitely and firmly convinced a mistake has been made." *Id.* (citing Sopko v. C & R Transfer Co., Inc., 1998 SD 8, ¶7, 575 NW2d 225, 228-29).

## Analysis and Decision

[¶27.] According to the Intervenors, the PUC erroneously applied SDCL 49-41B-22, and therefore, our review must be de novo, and we should accord no deference to the PUC's decision that Big Stone II will not pose a threat of serious injury to the environment. They argue that the PUC "was duty-bound to recognize" the findings by the scientific community concerning the impact of $CO_2$ emissions on

global warming. Moreover, they argue that the PUC's finding that Big Stone II will emit 4.7 million tons of $CO_2$ each year clearly demonstrates that the plant will pose a threat of serious harm to the environment.

[¶28.]     The Applicants respond that there are no regulations governing the emission of $CO_2$, and thus there are no standards by which to conclusively establish what amount of emission constitutes a threat of serious injury to the environment. According to the Applicants, the PUC was required to determine if Big Stone II, not all coal-fired facilities, will pose a threat of serious injury to the environment. Because Big Stone II is calculated to increase U.S. emissions by 0.0007, or seven hundredths of one percent, the Applicants contend that the PUC's conclusion is not clearly erroneous in light of all the evidence. Moreover, the PUC required that the Applicants report annually on any $CO_2$ regulations and their efforts to bring Big Stone II into compliance.

[¶29.]     We review the PUC's decision and decide whether, based on the evidence as a whole, we are left with a definite and firm conviction that a mistake has been made. *See Sopko*, 1998 SD 8, ¶6, 575 NW2d at 228. While we give due regard to an agency's well-reasoned and fully informed decision, we will not uphold clear errors of judgment or conclusions unsupported in fact. Our task in this appeal is to decide the narrow question of whether the PUC's conclusion that Big Stone II will not pose a threat of serious injury to the environment was clearly erroneous in light of all the evidence. *See id.*

[¶30.]     There were over 1,400 pages of documentary evidence submitted in this case. The Applicants offered evidence of studies conducted concerning the

effect Big Stone II might have on the environment and the community.  They also submitted evidence regarding the alternative sources of energy they considered, but ruled out.  The Intervenors do not dispute the Applicants' need for the additional wattage.  Nor do they present an argument that there exists a viable alternative to Big Stone II's coal-fired facility.  More significantly, the Intervenors suggest no standards by which the PUC may assess what amount of $CO_2$ emissions are tolerable.  Rather, they maintain that $CO_2$ emissions, at any measurable level, seriously harm the environment.

[¶31.]    Global warming presents a momentous and complex threat to our planet.  A resolution for this problem, critical though it is, cannot be made in the isolation of judicial proceedings.  The social, economic, and environmental consequences of global warming implicate policy decisions constitutionally reserved for the executive and legislative branches.  To date, no $CO_2$ emission standards have been enacted by our political leaders.  "Congress has recognized that carbon dioxide emissions cause global warming and that global warming will have severe adverse impacts in the United States, but it has declined to impose any formal limits on such emissions."  Connecticut v. American Elec. Power Co., Inc., 406 FSupp2d 265, 268-69 (SDNY 2005) (citing The Global Climate Protection Act of 1987, PL 100-204, Title XI, §§1102-03, reprinted at 15 USC §2901 note).[6]

---

6.    Recently, the United States Supreme Court ruled that the EPA was authorized to regulate $CO_2$ when the Court interpreted the phrase "any air pollutant" in the Clean Air Act to include automobile carbon dioxide emissions.  *See* Massachusetts v. E.P.A., -- US --, 127 SCt 1438, 1460-61, 167 LEd2d 248 (2007).  The Court reasoned that the use of the word "any"

(continued . . .)

[¶32.]     As members of the judiciary, we refrain from settling policy questions more properly left for the Governor, the Legislature, and Congress. No matter how grave our concerns on global warming, we cannot allow personal views to impair our role under the Constitution. In South Dakota, the Legislature designated the PUC as the responsible agency for this question of granting a permit. We must uphold the PUC's decision unless we conclude that the ruling was "clearly erroneous in light of the entire evidence in the record or arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion." *See* Korzan v. City of Mitchell, 2006 SD 4, ¶12, 708 NW2d 683, 686 (citing SDCL 1-26-36).

[¶33.]     The PUC, in its thirty-four page decision, entered several findings of fact concerning the issue of global warming and $CO_2$ emissions. It recognized that despite the asserted scientific consensus on the harm caused from global warming, neither Congress nor the South Dakota Legislature has chosen to regulate $CO_2$ emissions. Therefore, the PUC addressed the potential harm from Big Stone II by comparing the projected level of $CO_2$ emissions from Big Stone II to the level of emissions nationally. Because Big Stone II would increase $CO_2$ emissions by 0.0007, or seven hundredths of one percent, the PUC concluded the threat of harm would not result in serious injury. Nonetheless, as a condition on the permit, the

_____

(. . . continued)
     indicated that the statute was intended to require regulation of all air pollutants. *Id.*

PUC required that the Applicants submit annual reviews of any regulations on $CO_2$ emissions and their efforts to comply with those regulations.[7]

[¶34.]     Our review of the record shows the PUC entered a well-reasoned and informed decision when it concluded that Big Stone II would not pose a threat of serious injury to the environment. It addressed the parties' contentions regarding global warming and $CO_2$ emissions and also provided a detailed explanation of why it rejected the findings proposed by the Intervenors.

[¶35.]     While global warming and $CO_2$ emissions are considered harmful by the scientific community, what will pose a threat of *serious* injury to the environment under SDCL 49-41B-22 is a judgment call initially vested with the PUC by the Legislature. Nothing in SDCL Chapter 49-41B so restricts the PUC as to require it to prohibit facilities posing any threat of injury to the environment. Rather, it is a question of the acceptability of a possible threat. Resolving what is acceptable for the people of South Dakota is not for this Court. The Legislature and Congress must balance the competing interests of economic development and protection of our environment. Based on all the evidence and our limited scope of review, the PUC's decision was not clearly erroneous.

---

7.     The Applicants must "submit an annual report to the [PUC] on $CO_2$" which "shall review any federal or state action taken to regulate carbon dioxide, how the operator plans to act to come into compliance with those regulations, the expected costs of those compliance efforts and the estimated effect of such compliance on rate-payers. The report should also evaluate operational techniques and commercially-available equipment being used to control $CO_2$ emissions at pulverized coal plants, the cost of those techniques or equipment, and whether or not the operator has evaluated the prudence of implementing those techniques or equipment."

#24485

[¶36.]     Affirmed.

[¶37.]     GILBERTSON, Chief Justice, and SABERS, ZINTER, and

MEIERHENRY, Justices, concur.