#29615-a-MES
**2022 S.D. 46**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

IN THE MATTER OF ADMINISTRATIVE
APPEAL GARRY EHLEBRACHT,
STEVEN GREBER, MARY GREBER,
RICHARD RALL, AMY RALL, AND
LARETTA KRANZ,                                          Appellees,

    and

AMBER KAY CHRISTENSON and
ALLEN ROBISH,                                          Appellants,

     v.

CROWNED RIDGE WIND, LLC, and
SOUTH DAKOTA PUBLIC UTILITIES
COMMISSION,                                          Appellees.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE THIRD JUDICIAL CIRCUIT
DEUEL COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DAWN M. ELSHERE
Judge

* * * *

R. SHAWN TORNOW
Sioux Falls, South Dakota                    Attorney for appellants.


MILES F. SCHUMACHER of
Lynn Jackson Shultz & Lebrun P.C.
Sioux Falls, South Dakota

* * * *

CONSIDERED ON BRIEFS
NOVEMBER 8, 2021
OPINION FILED **08/03/22**

BRIAN J. MURPHY of
NextEra Energy Resources, LLC
Juno Beach, Florida

Attorneys for appellee Crowned Ridge Wind, LLC.


AMANDA M. REISS
KRISTEN N. EDWARDS of
South Dakota Public Utilities Commission

Attorneys for appellee South Dakota Public Utilities Commission.

#29615

SALTER, Justice

[¶1.]	Crowned Ridge Wind II, LLC (Crowned Ridge) applied to the South Dakota Public Utilities Commission (the PUC) seeking permission to construct a large wind energy farm in northeast South Dakota. Several individuals from Grant and Codington Counties who were affected by the potential wind farm intervened to oppose Crowned Ridge's application. The PUC conducted a contested case hearing and later issued a written decision approving the permit. The intervenors sought review in the circuit court. The court affirmed the PUC's decision and two of the intervenors now appeal to this Court. We affirm.

## Facts and Procedural History

[¶2.]	Crowned Ridge requested permission from the PUC to construct a wind farm comprised of 132 wind turbines capable of producing 300.6 megawatts of electricity in Codington, Grant, and Deuel Counties (the Project).[1] In addition to Crowned Ridge, other parties to the permit application process included PUC staff as well as "[a]ny person residing in the area where the facility is proposed to be sited, or any directly interested person" who applies for and obtains "party status." SDCL 49-41B-17(4). Amber Christenson and Allen Robish (the Intervenors), both of

---

1.	Under the provisions of SDCL 49-41B-2(13), the Project was defined as a "[w]ind energy facility" because its size and design contemplated generating "one hundred megawatts or more of electricity." The Project also satisfied the broader statutory definition of a "[f]acility," which includes a wide variety of energy facilities. SDCL 49-41B-2(7). Accordingly, Crowned Ridge could not begin construction of the Project without obtaining a permit from the PUC. *See* SDCL 49-41B-4.

whom live in rural areas near the Project, timely sought and obtained party status to oppose the issuance of the permit.[2]

[¶3.] The PUC conducted a contested case hearing using the procedures set out in South Dakota's Administrative Procedure Act contained in SDCL chapter 1-26. *See* SDCL 49-41B-17.2. As part of the hearing, the PUC received evidence concerning the potential impacts of the Project on the environment and surrounding communities.

[¶4.] The hearing produced extensive testimony from seventeen witnesses, many of whom submitted "pre-filed" testimony and exhibits detailing the evidence they developed and reviewed concerning the potential impacts of the Project.[3] The Intervenors raised several points of contention with the permit application. As they relate to this appeal, the Intervenors questioned Crowned Ridge's compliance with a Conditional Use Permit (CUP) issued by Grant County, the future impact the Project would have on solid waste management facilities, and the potential adverse health effects the Project would have on local inhabitants.

---

2.  The PUC also granted party status to seven additional area residents who opposed the issuance of the permit. Six of those individuals were represented by different counsel during all stages of their challenge to the permit application process and were parties to the appeal decided in *Ehlebracht v. Crowned Ridge Wind II, LLC*, 2022 S.D. 19, 972 N.W.2d 477.

3.  *See* ARSD 20:10:22:39 (stating in part, "[u]pon the filing of an application pursuant to SDCL 49-41B-11, an applicant shall also file all data, exhibits, and related testimony which the applicant intends to submit in support of its application").

***The Grant County CUP***

[¶5.]       Prior to the hearing, Crowned Ridge submitted pre-filed testimony of senior project manager Tyler Wilhelm who stated that Crowned Ridge was "responsible for obtaining all applicable federal, state, and local permits" required for construction of the Project.  On behalf of Crowned Ridge, Wilhelm applied for a Wind Energy System CUP from the Grant County Board of Adjustment, which the Board approved.  The CUP application stated that "[the Project] adheres to the . . . *Wind Energy System* requirements, as outlined in § 1211[,] Energy System (WES) Requirements of the Grant County Zoning Ordinance."

[¶6.]       During Wilhelm's testimony at the contested case hearing, the Intervenors questioned him regarding a subsequent amendment to the Grant County zoning ordinances governing wind energy facilities.  The zoning ordinance in effect at the time the Grant County Board of Adjustment issued the CUP to Crowned Ridge contained a provision limiting the maximum level of ambient noise produced by wind turbines to 50 dBA[4] "at the perimeter of the principal and accessory structures . . . ."  However, eleven days after the issuance of the Crowned Ridge CUP, Grant County amended the ordinance, limiting the sound generated by

---

4.       The unit abbreviation "dBA" refers to "A-weighted decibels."  It is "a unit for measuring sound levels, approximately equal to the smallest difference in loudness detectable by the human ear."  *Atkinson v. City of Pierre*, 2005 S.D. 114, ¶ 42 n.13, 706 N.W.2d 791, 802 n.13 (Sabers, J., dissenting).

wind turbines to "45 dBA . . . measured twenty-five (25) feet from the perimeter of the existing non-participating residences[5] . . . ."

[¶7.] According to Wilhelm, Crowned Ridge had, in fact, been instrumental in the amendment to the noise ordinance, explaining that "[w]e were part of that . . . process with the counties to get a new wind ordinance in place . . . ." Although Wilhelm acknowledged that the CUP was issued to Crowned Ridge prior to the adoption of the amended ordinance, he maintained that "[Crowned Ridge's] application that we filed is 100 percent consistent with what was adopted after our filing and our approval date."

[¶8.] Crowned Ridge also submitted pre-filed testimony from Jay Haley, a wind energy consultant, who was engaged by Crowned Ridge to conduct studies using computer-based modeling to estimate the level of noise the wind turbines would produce during operation. During Haley's testimony at the hearing, the Intervenors also questioned him about the amendment to the Grant County zoning ordinance. Haley testified that, in order to test compliance with the Grant County zoning ordinance in effect at the time the CUP was issued, he conducted sound studies on all principal and accessory structures located within the Project's footprint, which included over 170 receptor locations. According to his study, each of the principal and accessory structures fell within the fifty-decibel limit contained in the original Grant County ordinance.

---

5. The term "non-participating residences" describes individuals living near a wind farm project who have not entered into lease or easement agreements to participate in the project with the wind farm developer.

[¶9.]     However, after the zoning ordinance was amended to require noise limits measured only at non-participating residences, Haley revised his study to include only those measurements. Haley testified that the final version of his study included four non-participating residences in Grant County. Based upon the results of his sound study, Haley opined that all four non-participating residences were forecasted to receive an ambient noise level below the forty-five-decibel limit imposed by the amended Grant County zoning ordinance.

### Solid Waste Management Facilities

[¶10.]     Crowned Ridge also submitted pre-filed testimony of Mark Thompson, the manager of wind engineering and construction for Crowned Ridge. Thompson's testimony concerned the details of the Project's construction, operation, maintenance, and eventual decommissioning. During the hearing, the Intervenors questioned Thompson about Crowned Ridge's plan for the disposal of what would potentially include millions of pounds of waste in the form of fiberglass turbine blades and other waste accumulated at the time of the Project's decommissioning. Thompson stated:

> The plan as it stands right now is to cut these blades up into pieces for transport and dispose of them in landfills. Now this is usually a contracted process. And the landfills could either be local or off-site or out of state. Given that we're over 20 years away [from decommissioning], we think that there would be, you know, processes that are developed or put in place to maybe recycle some of these.

[¶11.] Crowned Ridge also submitted pre-filed testimony from Christopher Ollson, PhD.[6] Dr. Ollson was engaged by Crowned Ridge to study the potential health implications associated with the Project's operation. At the evidentiary hearing, the Intervenors asked Dr. Ollson about the potential for carcinogens leaching into the environment in the event the turbine blades were disposed of in a local landfill. Although Dr. Ollson admitted he had not been engaged by Crowned Ridge to study the precise effects of blade disposal, he testified that "[the turbine blades] would have to be disposed of in a properly licensed landfill, and that landfill itself would be monitored. But there's nothing from the blades that would come out of the blades and enter into the environment and impact health." Ultimately, Dr. Ollson concluded that "there would be no undue risk from anybody living around the landfill [because] of blades being disposed of."

[¶12.] Darren Kearney, a utility analyst employed by the PUC staff, also testified about the turbine blade disposal process. Kearney testified that the PUC staff believed the topic of blade disposal in the future was best addressed by ensuring adherence to the decommissioning plan proposed by Crowned Ridge, verifying that Crowned Ridge was financially prepared to fund the decommissioning process, and confirming that proper disposal practices were observed. According to Kearney, the PUC staff "[does not] get into the details of where those wastes are going to go, what specific landfill they're going to be placed in. That will be decided 25 years from now when the blades are ready for removal." Pursuant to Crowned

6. Dr. Ollson is an environmental health scientist who, according to his pre-filed testimony, is "trained, educated, and practiced in the evaluation of potential risks and health effects to people associated with environmental health issues."

Ridge's decommissioning plan, which Kearney had reviewed, the "[m]aterials will be disposed where disposal is permitted and where there is capacity for the disposal . . . . All unsalvageable materials will be disposed of at authorized sites in accordance with applicable regulations."

### *Potential Adverse Health Effects*

[¶13.] The Intervenors' final basis for opposing the permit revolved around the potential adverse health effects the Project might have on the local residents living near or within the Project boundary. The Intervenors' allegations on this point pervaded the entirety of the hearing, and testimony from several of the witnesses focused specifically upon the topics of health and safety.

[¶14.] The Intervenors questioned Haley about the possibility of measuring other types of sound. For instance, Haley acknowledged that Crowned Ridge did not request, and he did not prepare, a study to measure the naturally occurring ambient noise levels within the Project's boundary as they existed prior to turbine construction. Haley further testified that he did not conduct a study on the Project's potential to produce infrasound.[7] Richard Lampeter, an acoustical consultant engaged by Crowned Ridge, similarly testified that he did not conduct an infrasound study for the Project.

[¶15.] Dr. Ollson testified that, after his review of the scientific literature concerning the effects of infrasound on human health, infrasound "would not be a

---

7. "Infrasound" refers to sound waves with frequencies below the limit of human audibility. *See Friends of Lincoln Lakes v. Bd. of Envtl. Prot.*, 989 A.2d 1128, 1132 (Me. 2010) (describing infrasound as registering a measurement of "less than twenty [hertz], [which is] generally considered the normal limit of human hearing").

concern for the Crowned Ridge project . . . ." Crowned Ridge also submitted pre-filed testimony of Robert McCunney, M.D. Dr. McCunney stated that, based on a study he co-authored, "there is no scientific evidence to support the hypothesis that wind turbine infrasound and low-frequency sound have unique diverse health effects that other sources of noise do not have."

[¶16.] David Hessler, an acoustical engineer engaged by the PUC staff to review the work conducted by Dr. Ollson and Dr. McCunney, stated in his pre-filed testimony that "no adverse health effects are likely to result from either the infrasonic or low frequency sound emissions from the Project." Hessler ultimately concluded that "the preponderance of the current evidence, research and the mainstream expert opinion indicates that there is no link between the extremely low levels of low frequency sound generated by wind turbines and any adverse health outcomes."

[¶17.] Finally, the Intervenors questioned Lampeter concerning the Project's potential impact on air quality. Lampeter acknowledged that Crowned Ridge had not asked him to conduct an air quality study relating to the Project. In its application, Crowned Ridge did address the topic of air quality and stated that "[n]o impacts [on air quality] from Project operation are anticipated nor will the Project produce air emissions that will impact the surrounding area." The application also stated Crowned Ridge's commitment to the use of "BMPs [best management practices] to minimize air quality pollution emissions" around the Project area.

***The PUC's Final Decision and Order***

[¶18.]     The PUC voted unanimously to approve Crowned Ridge's permit and issued a final decision and order that included findings of fact and conclusions of law.[8] As it relates to this appeal, the PUC determined that "the Project will comply with applicable laws and rules," that "[t]he Project will be decommissioned in accordance with applicable state and county regulations," that "the Project will comply with applicable air and water quality standards and regulations," and that Crowned Ridge "has appropriately minimized the sound level produced from the Project." The PUC ultimately concluded that Crowned Ridge "satisfied [its] burden of proving all of the requirements imposed by SDCL 49-41B-22 for issuance of the permit to construct by the preponderance of the evidence."

[¶19.]     The Intervenors timely filed a notice of appeal in circuit court. *See* SDCL 49-41B-30 ("Any party to a permit issuance proceeding aggrieved by the final decision of the Public Utilities Commission on an application for a permit, may obtain judicial review of that decision by filing a notice of appeal in circuit court."). The Intervenors asked the court to reverse the PUC's decision, arguing that Crowned Ridge had failed to meet its burden of proof under SDCL 49-41B-22[9] and claiming the evidence did not establish that "the proposed facility will comply with all applicable laws and rules [or that] the facility will not substantially impair the

---

8.    *Crowned Ridge Wind II, LLC*, No. EL19-027, 2020 WL 1877721 (S.D. P.U.C. Apr. 6, 2020).

9.    As explained in greater detail below, SDCL 49-41B-22 lists four requirements an applicant must establish for the issuance of a siting permit, including compliance with all applicable laws, no threat of serious injury in the siting area, no impairment to health, safety and welfare, and no undue interference with "orderly development of the region[.]"

health, safety or welfare of the inhabitants." Citing testimony from the contested case hearing, the Intervenors asserted that Crowned Ridge failed to abide by the zoning ordinance in effect at the time the Grant County CUP was issued, that Crowned Ridge failed to follow a specific PUC rule requiring plans for disposal of solid waste, and that Crowned Ridge's failure to procure an air quality study or a pre-construction sound study within the Project's boundary rendered infirm the PUC findings and conclusions related to the Project's health and safety effects.

[¶20.] The circuit court rejected the Intervenors' arguments and affirmed the issuance of the permit. In their current appeal to this Court, the Intervenors have raised what are essentially four issues for our review.[10] We restate them as follows:

1. Whether the PUC erroneously determined that the Project complied with all applicable laws and rules.

2. Whether the PUC clearly erred when it found that Crowned Ridge complied with both versions of the Grant County ordinance.

3. Whether the PUC erroneously determined that Crowned Ridge complied with applicable administrative rules.

---

10. This decision fits within a group of cases involving wind energy projects in northeast South Dakota. Though there are certain overlapping or similar factual aspects, we have carefully considered the particular arguments presented in each case. Nevertheless, the cases feature the same or similar party names, and in an effort to avoid confusion and distinguish these unique cases, we provide the following descriptions for each of these other decisions: *Ehlebracht v. Deuel Cnty. Planning Comm'n*, 2022 S.D. 18, 972 N.W.2d 464 (challenge to Deuel County permitting process relating to the Crowned Ridge Wind II project); *Ehlebracht v. Crowned Ridge Wind II, LLC*, 2022 S.D. 19, 972 N.W.2d 477 (challenge to PUC permitting process relating to the Crowned Ridge Wind II project); *Christenson v. Crowned Ridge Wind, LLC*, 2022 S.D. 45, 978 N.W.2d 756 (challenge to PUC permitting process relating to the Crowned Ridge Wind project).

4. Whether the PUC clearly erred when it found that the Project would not impact the health, safety, or welfare of the inhabitants within the Project area.

**Standard of Review**

[¶21.] The text of SDCL 1-26-36 provides the standard used to determine whether an administrative agency's decision may be reversed or modified, and provides in relevant part:

> The court shall give great weight to the findings made and inferences drawn by an agency on questions of fact. The court may affirm the decision of the agency or remand the case for further proceedings. The court may reverse or modify the decision if substantial rights of the appellant have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
>
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority of the agency;
> (3) Made upon unlawful procedure;
> (4) Affected by other error of law;
> (5) Clearly erroneous in light of the entire evidence in the record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

[¶22.] The provisions of "SDCL 1-26-36 delineate[ ] the standard for a circuit court's review of an administrative agency's decision, and '[t]he same rules apply on appeal to this Court.'" *Anderson v. S.D. Ret. Sys.*, 2019 S.D. 11, ¶ 10, 924 N.W.2d 146, 148–49 (alteration in original) (quoting *Lagler v. Menard, Inc.*, 2018 S.D. 53, ¶ 22, 915 N.W.2d 707, 715). Specifically, we have held that:

> Questions of law are reviewed de novo. *Dakota Trailer Mfg., Inc. v. United Fire & Cas. Co.*, 2015 S.D. 55, ¶ 11, 866 N.W.2d 545, 548. Matters of reviewable discretion are reviewed for abuse. SDCL 1-26-36(6). The agency's factual findings are reviewed under the clearly erroneous standard. SDCL 1-26-36(5). The agency's decision may be affirmed or remanded but cannot be reversed or modified absent a showing of prejudice. SDCL 1-26-36.

*Id.* (citation omitted).

[¶23.] To determine whether an agency's findings of fact are clearly erroneous, "[w]e review the PUC's decision and decide whether, based on the evidence as a whole, we are left with a definite and firm conviction that a mistake has been made." *In re Otter Tail Power Co. ex rel. Big Stone II*, 2008 S.D. 5, ¶ 29, 744 N.W.2d 594, 603.

[¶24.] We note at the outset that there appears to have been some confusion among the parties and the circuit court regarding the proper standard of review applicable to an agency's findings of fact. The appellate briefs of the Intervenors and Crowned Ridge, as well as the circuit court's memorandum opinion, all state that an agency's factual findings are reviewed under a "substantial evidence" standard. However, this is not correct.

[¶25.] We have noted that "SDCL 1-26-36 was amended effective July 1, 1978, changing the standard of review for sufficiency of the evidence from 'unsupported by substantial evidence on the whole record' to 'clearly erroneous.'" *Sopko v. C & R Transfer Co., Inc.*, 1998 S.D. 8, ¶ 7, 575 N.W.2d 225, 228. As we stated in *Sopko*, "[e]ven when substantial evidence supports a finding, reviewing courts must consider the evidence as a whole and set it aside if they are definitely and firmly convinced a mistake has been made." *Id.* ¶ 7, 575 N.W.2d at 228–29.

[¶26.] The definition of "substantial evidence" cited in the circuit court's memorandum opinion still exists in a separate section of the code, *see* SDCL 1-26-1(9), but the Legislature has removed it from the standard in SDCL 1-26-36. While we have previously held that the use of the substantial evidence standard in lieu of

the correct, clearly erroneous standard constituted reversible error, *see In re Neb. Pub. Power Dist.*, 354 N.W.2d 713, 718 (S.D. 1984), reversal on those grounds is not necessary here given our authority to review the PUC's decision in essentially the same position as the circuit court. *See Sopko*, 1998 S.D. 8, ¶ 7, 575 N.W.2d at 229 (determining that "no remand is required" where the circuit court incorrectly applied the substantial evidence standard because "we review the [agency's] fact findings the same as the circuit court").[11]

## Analysis and Decision

### *The Project's Compliance with Applicable Laws and Rules*

[¶27.]     As an administrative body, the PUC is charged with overseeing the siting and construction of large-scale wind energy facilities within the state. *See* SDCL 49-41B-1 ("[A] facility may not be constructed or operated in this state without first obtaining a permit from the [PUC]."); SDCL 49-41B-4 ("No utility may begin construction of a facility . . . without first having obtained a permit issued . . . by the [PUC] . . . ."). An applicant seeking a wind energy facility construction permit from the PUC must establish by the preponderance of evidence that:

> (1) The proposed facility will comply with all applicable laws and rules;
>
> (2) The facility will not pose a threat of serious injury to the environment nor to the social and economic condition of inhabitants or expected inhabitants in the siting area. An applicant for an electric transmission line, a solar energy facility, or a wind energy facility that holds a conditional use permit from the applicable local units of government is

11.     In our *In re Neb. Pub. Power Dist.* decision, we stated that the "[u]se of the wrong standard of review is not merely harmless error[,]" 354 N.W.2d at 718, but we, nevertheless, considered the PUC's harmless error argument and applied the correct standard of review. *See id.* at 719.

> determined not to threaten the social and economic condition of inhabitants or expected inhabitants in the siting area;
>
> (3) The facility will not substantially impair the health, safety or welfare of the inhabitants; and
>
> (4) The facility will not unduly interfere with the orderly development of the region with due consideration having been given the views of governing bodies of affected local units of government.  An applicant for an electric transmission line, a solar energy facility, or a wind energy facility that holds a conditional use permit from the applicable local units of government is in compliance with this subdivision.

SDCL 49-41B-22.

[¶28.]        Additionally, the Legislature has delegated to the PUC the authority to promulgate rules governing the permitting and construction of wind energy facilities.  *See* SDCL 49-41B-35 ("To implement the provisions of this chapter regarding facilities, the [PUC] shall promulgate rules pursuant to chapter 1-26.").  The PUC has, in turn, adopted corresponding rules.  *See generally* ARSD 20:10:22 (Energy Facility Siting Rules).  Included among the PUC's specific rules is ARSD 20:10:22:23, which states in relevant part: "The applicant shall include an identification and analysis of the effects the construction, operation, and maintenance of the proposed facility will have on the anticipated affected area including . . . [a] forecast of the impact on . . . solid waste management facilities . . . ."

[¶29.]        Based on these statutory and regulatory requirements, the Intervenors make several claims—some factual and some legal.  First, they allege that Crowned Ridge failed to meet its burden to establish that the Project will comply with applicable laws and rules because Crowned Ridge conducted sound modeling based

on a zoning ordinance that was amended after Crowned Ridge obtained a CUP. However, this argument overstates the significance of the amendment and overlooks the textual standard of SDCL 49-41B-22(1).[12]

[¶30.] As to this latter point, SDCL 49-41B-22(1) requires an applicant for a wind energy facility siting permit to establish that the project "*will* comply with all applicable laws and rules[.]" (Emphasis added). This inquiry is forward looking and does not allow, as the Intervenors argue, an opportunity for the PUC to conduct a post hoc review of the Grant County Board of Adjustment's decision to issue the CUP.

[¶31.] Conditional use permits are creatures of statute and concern only the county from which they originate. *See In re Conditional Use Permit No. 13-08*, 2014 S.D. 75, ¶ 11, 855 N.W.2d 836, 839 ("[T]he South Dakota Legislature empowered individual counties to not only enact their own zoning ordinances, but also to permit conditional uses of real property that might otherwise be contrary to those zoning ordinances."); *see also* SDCL 11-2-17.3 (stating, among other things, the requirements for county approval of a conditional use permit). As such, the PUC is not involved in granting CUPs or drafting the ordinances around which the CUPs are authorized.

[¶32.] This is not to say the PUC should not consider whether the applicant has procured the necessary authorization from local authorities or its current

---

12. The question of whether the PUC properly applied SDCL 49-41B-22(1) to Crowned Ridge's permit request requires our interpretation of the statute and "the application of fixed rules of law" and we therefore review it de novo. *See Hartpence v. Youth Forestry Camp*, 325 N.W.2d 292, 296 (S.D. 1982) (citation omitted).

compliance with the various regulatory requirements of other governmental bodies as a means to predict future compliance with applicable laws and rules. This is certainly an appropriate area of inquiry. But SDCL 49-41B-22(1) does not require or authorize the PUC to act as a judicial body with the authority to determine disputes as to the issuance of the applicant's multitude of permits, licenses, or certifications. *See Nw. Bell Tel. Co. v. Chi. & N. W. Transp. Co.*, 245 N.W.2d 639, 641 (S.D. 1976) ("The Public Utilities Commission is an administrative body authorized to find and determine facts, upon which the statutes then operate. It is not a court and exercises no judicial functions." (quoting *In re Svoboda*, 74 S.D. 444, 447, 54 N.W.2d 325, 327 (1952))).

[¶33.] In an effort to apply the forward-looking standard of SDCL 49-41B-22(1), the PUC attached a condition to the permit requiring Crowned Ridge to "construct, operate, and maintain the Project in a manner consistent with . . . all applicable permits issued by a federal, state, or local agency with jurisdiction over the Project[.]" This unquestionably includes the Grant County CUP. Moreover, this condition—requiring compliance with all applicable laws—and other conditions imposed by the PUC are not simply moral obligations. Noncompliance can be addressed through civil and criminal remedies specifically authorized by statute. *See* SDCL 49-41B-34 (stating each person "who constructs, operates, or maintains a facility" that does not comply with a permit "is guilty of a Class 1 misdemeanor and is subject to a civil penalty of not more than ten thousand dollars" with "[e]ach day of violation . . . constitut[ing] a separate offense").

[¶34.]     In the end, we believe the PUC correctly applied the legal standard in SDCL 49-41B-22(1) by requiring Crowned Ridge to "comply with all applicable laws and rules." The statute did not, as the Intervenors suggest, obligate the PUC to inquire further into the Grant County permitting process.

[¶35.]     Beyond this, the fact that the CUP was issued under the former Grant County ordinance regulating noise from wind turbines does not mean that Crowned Ridge will *not* comply with "all applicable laws and rules." The Intervenors' logic suggesting a contrary view is unsound and also contrary to the evidence contained in the record, which supports the conclusion that the noise generated from the Crowned Ridge Project will, in any event, satisfy both versions of the Grant County ordinance.[13]

[¶36.]     In fact, the PUC considered this very argument during the contested case hearing and was convinced that Crowned Ridge was already in compliance with the applicable laws and rules in Grant County at the time the permit application was submitted. In footnote twenty-four of its final decision and order, the PUC explained:

> At the evidentiary hearing, pro se Intervenor Christenson questioned whether Applicant was in compliance with the Grant County Ordinance in effect at the time Grant County voted to approve the Project or the Ordinance that was made effective after the County's vote to approve the Project. Applicant testified that Grant County has indicated it intends to apply the Ordinance made effective shortly after approval of the CUP for the Project . . . . The record in this proceeding shows that Crowned Ridge Wind II complies with both versions of the Grant County Ordinance - the one in effect at the time of the approval of the Project by Grant County, and the one made effective shortly after the vote . . . . Therefore, the record shows that

---

13.     This is a question of fact we review for clear error.

> Crowned Ridge Wind II will be in compliance with applicable laws, including the Grant County Ordinance.

[¶37.] This conclusion is supported by the testimony of Jay Haley, who confirmed that, after the new zoning ordinance went into effect, the four non-participating homes in Grant County were forecasted to receive fewer than forty-five decibels of noise from the Project.[14]

[¶38.] Suffice it to say that the PUC's factual findings indicate that Crowned Ridge possesses a valid Grant County CUP and, irrespective of which ordinance applies, the Project is currently in compliance. Therefore, the PUC's determination that Crowned Ridge will continue to comply with applicable laws and rules is not clearly erroneous.[15]

[¶39.] The Intervenors make an additional claim that Crowned Ridge failed to meet its burden under SDCL 49-41B-22(1) because it did not adequately comply with ARSD 20:10:22:23, which requires the applicant to include "[a] forecast of the impact" that "construction, operation, and maintenance of the proposed facility" will have on "solid waste management facilities[.]" The Intervenors point to section

---

14. Intervenor Christenson resides in Codington County and her home was predicted by Haley's study to receive a noise level of forty-one and two tenths decibels from the Project. Intervenor Robish lives in Grant County and his home was predicted to receive a noise level of thirty decibels.

15. This case bears little resemblance to the Intervenors' principal authority, *In re Conditional Use Permit Granted to Van Zanten*, 1999 S.D. 79, 598 N.W.2d 861. In *Van Zanten*, we held that an ordinance that applied when the circuit court first considered an appeal from a county commission's zoning decision continued to apply after a limited remand and the case's return to circuit court. *Id.* ¶ 11, 598 N.W.2d at 864. However, the result was narrowly drawn to account for the "procedural wrinkle" presented by the limited remand and the intervening change in the ordnance—something we termed a "unique procedural situation[.]" *Id.* ¶ 10.

eighteen of Crowned Ridge's application, which addresses the Project's "Community Impact" under ARSD 20:10:22:23, claiming that section's cursory statements regarding solid waste management facilities are "unsubstantiated [and] unproven[.]" We disagree. Whether Crowned Ridge complied with ARSD 20:10:22:23 is a mixed question of law and fact, which we will review de novo. *Permann v. Dep't of Labor*, 411 N.W.2d 113, 119 (S.D. 1987).

[¶40.]     Here, section eighteen of Crowned Ridge's permit application states, "[c]onstruction and operation of the Project . . . is not anticipated to have significant short- or long-term effects on . . . solid waste management facilities . . . ." Although the PUC has not directly interpreted the meaning of the term "forecast," we believe section eighteen of the application adequately complies with the regulation's requirements.

[¶41.]     To the extent this issue requires the interpretation of ARSD 20:10:22:23, we interpret its terms using the same principles used in the interpretation of statutes. *In re Black Hills Power, Inc.*, 2016 S.D. 92, ¶ 8, 889 N.W.2d 631, 633. "When regulatory language is clear, certain and unambiguous, [the Court's] function is confined to declaring its meaning as clearly expressed. It is fundamental 'that the words of a [rule] must be read in their context and with a view to their place in the overall [regulatory] scheme.'" *Id.* ¶ 9, 889 N.W.2d at 634 (alterations in original) (citations omitted).

[¶42.]     The language of ARSD 20:10:22:23 is clear, certain, and unambiguous. Given its ordinary meaning, "forecast" is used in this regulation to require "a prediction, as of coming events." *Forecast*, *American Heritage College Dictionary*

532, (3d ed. 1997). Crowned Ridge's prediction in section eighteen of its application that it did not anticipate any short- or long-term effects on solid waste management facilities was made by drawing on the subject matter knowledge and expertise of Crowned Ridge employees and consultants, developed over years of directly applicable experience in connection with similar projects. Read in the context of the entire application, the single line cited by the Intervenors was not so much cursory as it was an apt summary. The 120-page application predicted minimal impact on solid waste management facilities by synthesizing a large body of findings and results obtained from analysis and studies conducted in preparation for construction.

[¶43.] As it relates to the Intervenors' concerns about blade disposal, the decommissioning phase of the project is regulated by ARSD 20:10:22:33.01, which requires an applicant to "provide a plan regarding the action to be taken upon the decommissioning and removal of the wind energy facilities[.]" The fifteen-page decommissioning plan was submitted as an appendix to Crowned Ridge's application and the testimony of Mark Thompson and Darren Kearney confirmed that a plan was in place to deal with authorized waste facilities. The PUC also required compliance with "the decommissioning plan set forth in Appendix N of the Application" as a condition of its issuance.

[¶44.] Therefore, Crowned Ridge complied with ARSD 20:10:22:23 by providing a forecast of the impact that the construction, operation, and maintenance of the Project would have on solid waste management facilities. Under the

circumstances, we conclude the PUC did not err when it determined Crowned Ridge met its burden of proof to comply with all applicable laws and rules.

### Health, Safety, and Welfare

[¶45.] The provisions of SDCL 49-41B-22(3) also require that a permit applicant establish by the preponderance of the evidence that "[t]he facility will not substantially impair the health, safety or welfare of the inhabitants." The PUC's determination on this point is a finding of fact that we review for clear error. *See Hartpence*, 325 N.W.2d at 296.

[¶46.] Here, the Intervenors make several allegations concerning the ways in which they believe Crowned Ridge failed to satisfy its burden of proof. First, they reallege their claim that failing to follow the original Grant County ordinance requiring sound measurements below fifty decibels at accessory structures "runs directly afoul" of SDCL 49-41B-22(3). However, this claim is not supported by the record.

[¶47.] The effect of the amendment was to lower the maximum allowable sound production for wind turbines from fifty decibels to forty-five decibels and adjust the locations at which measurements were required to be taken from "principal and accessory structures" to "non-participating residences." The Intervenors allege that because the amended ordinance reduced the number of structures at which sound must be measured, they are deprived of an additional regulatory "buffer." We are not convinced.

[¶48.] The amended Grant County ordinance is, in some ways, *more* stringent because it requires a lower sound threshold at the occupied structures of non-

participating landowners. But it is unnecessary to determine the question of relative rigor between the old and new versions of the ordinance. As noted above, Jay Haley's unrebutted testimony and sound study established that the Project also complied with the fifty-decibel limit even at unoccupied accessory structures. Therefore, it was not clear error for the PUC to determine that adopting the noise levels set out in the amended Grant County ordinance posed no danger to the health, safety, or welfare of the inhabitants living near the Project.

[¶49.] Next, the Intervenors claim that Crowned Ridge failed to meet its burden under SDCL 49-41B-22(3) "to the extent that no-preconstruction sound study was submitted to . . . the PUC." However, as previously stated, Crowned Ridge did, in fact, submit a sound study prior to the date of commercial operation, conducted by Jay Haley, which estimated the predicted noise levels the Project would produce.

[¶50.] After careful review of the record and the briefs, it appears that the Intervenors' "pre-construction sound study" term refers to a field study to measure the ambient sound that existed naturally in the area prior to construction of the Project. Crowned Ridge did not commission such a test, but it is unclear what assistance it would have provided on the question of health and safety. We therefore find this argument to be unsustainable.

[¶51.] The Intervenors also claim that Crowned Ridge failed to meet its burden under SDCL 49-41B-22(3) because it did not submit a study on the effects of infrasound. However, several witnesses provided expert testimony noting the absence of any health effects stemming from infrasound. Dr. Ollson and Dr.

McCunney both testified that infrasound presented no adverse health effects to humans. Darren Kearney, the PUC's utility analyst, reviewed the testimony of Dr. Ollson and Dr. McCunney and agreed that infrasound did not pose a threat to human health. Therefore, it was not clearly erroneous for the PUC to determine Crowned Ridge met its burden of proof to demonstrate that "[t]he facility will not substantially impair the health, safety or welfare of the inhabitants" as it related to the topic of infrasound.

[¶52.] The Intervenors further claim that Crowned Ridge failed to meet its burden of proof under SDCL 49-41B-22(3) because it did not submit an air quality study to the PUC. The Intervenors cite ARSD 20:10:22:21, which states "[t]he applicant shall provide evidence that the proposed facility will comply with all air quality standards and regulations . . . ." Section sixteen of Crowned Ridge's application analyzes the existing air quality in South Dakota and predicts no emissions from the Project that would impact the surrounding area. This is perhaps not surprising given that wind energy production typically does not involve the emission of carbon dioxide or other particulate airborne pollutants generally associated with energy produced from fossil fuels. *See* Christine Real de Azua*, The Future of Wind Energy*, 14 Tul. Envtl. L.J. 485, 495–96 (2001) (comparing emission levels for traditional forms of energy production to wind energy production).

[¶53.] In any event, at multiple points in its application and throughout the testimony in the contested case hearing, Crowned Ridge agreed to comply with all applicable regulations and obtain any permits required by state or federal regulatory agencies. Crowned Ridge also committed to using best management

practices to avoid adverse impacts to air quality during construction. Furthermore, the text of the regulation does not specifically require an air quality study, but merely states that the applicant must provide evidence that the facility will comply with air quality regulations. The PUC's determination that Crowned Ridge has done so was not clearly erroneous.

[¶54.] Finally, the Intervenors make a passing reference to a host of "health concerns" in the final footnote to their brief.[16] However, these claims are not sufficiently developed with legal arguments for their support and we decline to address them further. Therefore, we hold the PUC's findings were not clearly erroneous as they relate to Crowned Ridge's burden under SDCL 49-41B-22(3).

## Conclusion

[¶55.] Based on our review of the record, the PUC followed the applicable statutory directives in granting the construction permit to Crowned Ridge and correctly determined that Crowned Ridge satisfied its burden of proof under SDCL 49-41B-22. We affirm.

[¶56.] KERN, DEVANEY, and MYREN, Justices, and SEVERSON, Retired Justice, concur.

[¶57.] SEVERSON, Retired Justice, sitting for JENSEN, Chief Justice, who deemed himself disqualified and did not participate.

---

16. The Intervenors generally mention the safety of travelers on the roadway, potential ice accumulation on turbine blades, and the impact of the Project on the health of wild and domestic animals.